# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## WESTERN DIVISION

JEFF ROEDER and CHRISTOPHER GRILL,

              Plaintiffs,

vs.

DIRECTV, INC., and DIRECTV, L.L.C.,

              Defendants.

No. C14-4091-LTS

**MEMORANDUM OPINION AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

---

## TABLE OF CONTENTS

I.     *Introduction* ................................................................................... 3

II.    *Procedural history* ....................................................................... 3

III.   *Relevant facts* ............................................................................... 4

IV.   *Analysis* ....................................................................................... 11

     A.   *DIRECTV's Motion to Strike Statement of Kevin Jackson* ............... 11

     B.   *Plaintiffs' Motion for Leave to File Statements of Additional Facts and Appendices Out of Time* ......................................................... 14

     C.   *Motions for Summary Judgment* ............................................. 16

          1.   *Were Plaintiffs Properly Classified as Independent Contractors?* ............................................................... 18

              a.   *Degree of Control* ................................................ 21

              b.   *Worker's Investment* ............................................ 34

              c.   *Degree to Which The Worker's Opportunity for Profit and Loss is Determined by The Alleged Employer* .............................................................. 37

d.      *Skill and Initiative in Performing The Job*.................. *41*

e.      *Permanency* ...................................................... *45*

f.      *Whether The Work is an Integral Part of The Business*............................................................... *48*

g.      *Other Factors* .................................................. *48*

h.      *Conclusion Regarding Independent Contractor or Employee  Status* .......................................... *52*

2.      *Was Grill Jointly Employed By DIRECTV?* ...................... *53*

3.      *Are Plaintiffs Exempt From Overtime Under The 7(i) Exemption?*................................................................ *54*

a.      *Is     DIRECTV     a     Retail     or     Service Establishment?* ................................................... *55*

b.      *Was   More   Than   Half   of   Plaintiffs'   Pay Commissions?*.................................................... *61*

c.      *Was Plaintiffs' Regular Rate of Pay At Least One and One-Half Times the Minimum Wage?* ................................................................ *65*

4.      *Is There Adequate Evidence Regarding DIRECTV's Knowledge of Any FLSA Violations?*................................ *67*

5.      *Are Roeder's Claims Barred By The FLSA's Statute of Limitations?*............................................................ *67*

6.      *Do Plaintiffs Have Sufficient Proof of Damages?*................. *69*

V.    *Conclusion* ................................................................. *71*

2

# I.    INTRODUCTION

This case is before me on motions (Doc. Nos. 59 and 62) for summary judgment by defendants DIRECTV, Inc., and DIRECTV, LLC,[1] as to all claims asserted by plaintiffs Jeff Roeder (Roeder) and Christopher Grill (Grill), along with plaintiffs' motion (Doc. No. 67) for partial summary judgment. Also before me are (1) DIRECTV's motion (Doc. No. 75) to strike the statement of Kevin Jackson, offered in support of plaintiffs' motion for partial summary judgment, and (2) plaintiffs' motion (Doc. No. 83) for leave to file statements of additional facts and appendices out of time. All motions are resisted. The parties have requested oral argument, but I find that oral argument is not necessary and would serve only to cause delay. *See* N.D. Ia. L. R. 7(c).

# II.    PROCEDURAL HISTORY

Roeder and Grill filed their complaint (Doc. No. 2) against DIRECTV on October 20, 2014. They allege that they worked as DIRECTV technicians and assert that DIRECTV violated the Fair Labor Standards Act of 1938 (FLSA) by failing to meet minimum wage[2] and overtime requirements. *Id.* DIRECTV filed a pre-answer motion (Doc. No. 13) to dismiss on January 2, 2015. On January 19, 2015, plaintiffs requested a stay pending the Judicial Panel on Multidistrict Litigation's ruling on motions for consolidation and transfer of related actions pursuant to 28 U.S.C. § 1407. Doc. No. 15. The motion was granted. Doc. No. 16. On February 12, 2015, the stay was lifted after consolidation was denied. Doc. No. 18. The Honorable Mark W. Bennett, to

---

[1] Defendants indicate that DIRECTV, Inc., merged into DIRECTV, LLC, effective January 1, 2012, with DIRECTV, LLC, being the surviving entity. Doc. No. 59 at n.1. While DIRECTV, Inc., has not been dismissed as a party, for the sake of simplicity I will refer to the defendants singularly as DIRECTV.

[2] Plaintiffs later stipulated they would not seek to recover based on their minimum wage claims under 29 U.S.C. § 206. Doc. No. 55.

whom this case was then assigned, denied DIRECTV's motion to dismiss on September 22, 2015. Doc. No. 24. DIRECTV filed an answer (Doc. No. 28) to the complaint on October 6, 2015. The case was subsequently reassigned to me.

On August 19, 2016, DIRECTV filed a motion (Doc. No. 59) for summary judgment on Roeder's claims and a separate motion (Doc. No. 62) for summary judgment on Grill's claims. DIRECTV also filed a motion (Doc. No. 65) to bifurcate/sever.[3] The same day, plaintiffs filed a joint motion for partial summary judgment on two of the same issues. Doc. No. 67.

On September 12, 2016, DIRECTV filed a motion (Doc. No. 75) to strike the statement of Kevin Jackson, which was submitted with plaintiffs' statement of facts in support of their motion for partial summary judgment. On September 13, 2016, plaintiffs filed a motion (Doc. No. 83) for leave to file statements of additional facts and appendices out of time. Both motions have been resisted. Doc. Nos. 90 and 93. Additionally, the parties filed resistances and replies to each other's motions for summary judgment. *See* Doc. Nos. 87-89, 91, 97-98.

A jury trial in this matter is currently scheduled to begin June 5, 2017. Doc. No. 104.

### III.    RELEVANT FACTS

The following facts are undisputed except where noted otherwise:

DIRECTV sells and provides satellite television service to the general public. More than 75 percent of DIRECTV's revenue comes from the sale of goods and services to end users, meaning the goods and services are not for resale. After a customer signs up for DIRECTV service, a technician will visit the customer's home or business to install the receiving equipment, which is owned by DIRECTV. Technicians may also

---

[3] This motion has been referred to Chief United States Magistrate Judge C.J. Williams.

4

receive work orders for service calls and upgrades. All of the dishes and receivers installed by technicians are owned by DIRECTV. Technicians are often the only representatives of DIRECTV who have personal contact with DIRECTV customers. Through DIRECTV's owned and operated division, DIRECTV Home Services, technicians employed by contracting companies or subcontractors install and service DIRECTV systems. Until 2008, DIRECTV entirely outsourced the installation function. As of 2015, more than half of DIRECTV's installations are still outsourced, meaning DIRECTV uses both W-2 employees and 1099[4] subcontractor technicians to install, service and maintain its satellite systems.

Roeder performed work orders for DIRECTV as a 1099 subcontractor through Wireless Technologies and White Communications in South Dakota and Sioux City, Iowa. DIRECTV's SIEBEL[5] system indicates Roeder performed work orders for DIRECTV from July 7, 2010, through May 31, 2012. Roeder was with Wireless Technologies from June 2009 through June 2010. However, Roeder took a 12-week break during that time to perform carpentry work. At some point, Wireless Technologies became ineligible to perform DIRECTV work in the Sioux Falls, South Dakota, market because it had been caught "ghosting." Ghosting occurs when a subcontracting company allows a technician to perform DIRECTV work orders using a technician identification number that is assigned to a different individual.

Roeder began performing DIRECTV work orders through White Communications in October 2010. He stopped working for White Communications around March 2011, and returned in September 2011. During this time, he took 20 to 30 consecutive days

---

[4] W-2 and 1099 refer to tax forms. W-2 forms are typically used for employees while 1099 forms are typically used for independent contractors. Use of a specific form is not determinative of whether an individual is an employee or independent contractor. *See Shelter Mut. Ins. Co. v. Jones*, 343 F.3d 925, 926 (8th Cir. 2003).

[5] SIEBEL was DIRECTV's online scheduling and management system to schedule, track and manage installation work performed by technicians during the relevant time.

off from performing DIRECTV work orders to go beaver trapping. He also requested time off to spend time with his son. He ended his employment with White Communications in May 2012. Between 2009 through 2012, Roeder completed approximately 800 DIRECTV installations. Out of these 800 installations, he can recall only three instances when a DIRECTV employee was onsite while he completed the orders. Roeder's work was reported under DIRECTV's field service site in Sioux Falls, South Dakota, which was managed by Chet Jones during the relevant time. Roeder interacted with his supervisor at Wireless Technologies only twice in five months. He interacted with his supervisor at White Communications on a daily basis.

Roeder did not work exclusively for White Communications and Wireless Technologies, as he also installed satellite systems for Dish Network, DIRECTV's main competitor. Roeder also picked up side work including carpentry, landscaping, handyman tasks, pre-cabling houses and bounty trapping. In 2012, the bulk of his income was from sources other than DIRECTV work orders. He reported $71,292 in gross receipts and sales for his work in 2012, of which $19,657.70 was income from White Communications. Roeder also performed custom labor for customers who paid him directly in cash or by check. Custom work included such things as wall fishing and installing a pole mount.

Grill performed work orders for DIRECTV as a 1099 subcontractor through U.S. Citadel, which was a subcontractor of HD Experts, which contracted with DIRECTV. Pursuant to the agreement between U.S. Citadel and HD Experts, U.S. Citadel agreed to perform DIRECTV installations, upgrades, service and repairs. DIRECTV's SIEBEL system indicates Grill performed work orders for DIRECTV from April 14, 2011 through August 26, 2011. Grill's work was reported under DIRECTV's field service site in Cedar Rapids, Iowa, which was managed by Kevin Jackson during the relevant time. Grill completed hundreds of work orders for DIRECTV while with U.S. Citadel. During this time, there were only two occasions in which a supervisor performed on-site quality

6

control inspections. Grill believed that Rich Glaspie, a DIRECTV employee, was his direct supervisor while he was at U.S. Citadel. Grill ended his relationship with U.S. Citadel in August 2011.

White Communications, Wireless Technologies and HD Experts all have virtually identical Service Provider Agreements with DIRECTV. These agreements contain the following clause:

> Contractor is an independent contractor authorized during the term hereof to perform and provide services to DIRECTV. Except as otherwise expressly provided herein, Contractor shall have full control over the methods, techniques, sequences, and procedures of the Services to be provided hereunder. This Agreement is intended to create an independent contractor relationship between the parties for purposes of federal, state and local law, including the Internal Revenue Code of 1986, as amended. Without limitation Contractor agrees to provide DIRECTV with a completed "Request for Taxpayer Identification Number and Certification" in which the applicable taxpayer identification number is identified. Because Contractor and Contractor's employees and subcontractors are not employees, franchisees, agents or otherwise of DIRECTV, Contractor and its employees and agents or otherwise of DIRECTV, Contractor and its employees and subcontractors are not entitled to any benefits to which DIRECTV employees may be entitled under DIRECTV policies or as otherwise required by law, including workers' compensation or unemployment compensation benefits.

White Communications Service Provider Agreement at ¶ 19 (Doc. No. 69 at 46); Wireless Technologies Service Provider Agreement at ¶ 19 (Doc. No. 69 at 192); HD Experts Service Provider Agreement at ¶ 19 (Doc. No. 69 at 152). All subcontractors of the contractor were also required to comply with the Service Provider Agreement.

Before DIRECTV would assign work to a subcontractor technician, he or she had to pass a criminal background check, a drug test and a motor vehicle record review, performed by DIRECTV's selected vendor. DIRECTV required the subcontracting companies to secure the written consent of each potential subcontractor to release his or her qualifying results to DIRECTV.

7

All DIRECTV work orders were required to be performed in accordance with DIRECTV's Standard Professional Installation Guide (SPIG) standards. DIRECTV also sets forth quality and technical requirements in its agreements with contractors such as Wireless Technologies, White Communications and HD Experts. DIRECTV provides the same technical training materials to the subcontracting companies that it provides to its W-2 employees. The Service Provider Agreements provide that technicians must "receive [ ] and successfully complete [ ] SBCA Certified Installer Training." Doc. No. 69 at 63, 168, 209.

As for technicians' dress and appearance, the Service Provider Agreements require "all subcontractor technicians, performing Services within the residences or commercial establishments of DIRECTV customers wear no less than the approved DIRECTV shirt and cap while performing the services." Doc. No. 69 at 64, 169, 210. The subcontracting companies could (in their sole discretion) also require DIRECTV logos to be displayed on vehicles and equipment.

Technicians were required to purchase work tools and equipment to perform DIRECTV installations. However, they had the discretion to purchase these tools and equipment from any vendor. Roeder spent $2,000 on equipment. Plaintiffs claimed these supplies and other business expenses as deductions on their tax returns. In 2012, Roeder claimed total expenses of $57,659. Grill claimed $5,280 in vehicle expenses and $488 in supplies for 2011. Plaintiffs were also required to have a vehicle and a computer or cellphone with access to the internet to complete work orders. Roeder and Grill both owned these items prior to performing DIRECTV work.

1099 technicians receive daily work orders from DIRECTV. When a customer puts in an appointment request, SIEBEL creates a work order, which is then assigned to a specific technician identification number.[6] The system does not differentiate between

---

[6] One exception to this is White Communications, which would receive work orders in bulk from DIRECTV and then assign technicians to each work order.

in-house W-2 employee technicians and subcontractor technicians. The system selects a specific technician for a work order based on the "three S's": (1) the technician's start and stop location (or the technician's service area); (2) the technician's schedule (the days and times the technician has indicated he or she is available for work); and (3) the technician's skill set (any specialized skills or certifications) needed to perform the work order. SIEBEL tracks every work order from its creation until it is closed or canceled.

SIEBEL also maintains a schedule provided by contracting companies for each technician. This schedule contains the technician's availability. It is not a schedule assigned by DIRECTV to a technician. For instance, if a technician needs a sick day or a day off for vacation, an "exception" is recorded in the SIEBEL system so no work orders are routed to that technician's number on that day. Unlike DIRECTV, contracting and subcontracting companies do not have access to SIEBEL. SIEBEL also keeps telephone numbers for technicians or the subcontractor owner or manager and keeps records of certifications obtained by technicians. For 1099 technicians, SIEBEL also has the technician's preferred starting address, skill set and work order history.

DIRECTV site managers are responsible for making sure all technicians in their region are complying with DIRECTV requirements. However, technicians are required to communicate directly with DIRECTV for specific work order tasks, such as arriving on site at a customer's location. Each DIRECTV site manager receives reports showing when technicians arrive on site at their morning and afternoon jobs. SIEBEL maintains an expected duration for each work order and some DIRECTV site managers receive "Assigned Duration" reports. DIRECTV personnel randomly visit a certain percentage of customer locations after jobs have been completed by 1099 technicians for quality assurance purposes. DIRECTV also follows up with customers through a post-call survey. The questions asked in the survey and the metrics of success for a technician's work are the same regardless of whether the technician is a 1099 technician or a W-2 technician. Customers are given only DIRECTV's central telephone number to call for

9

any issues regarding their service.

The Service Provider Agreements DIRECTV has with White Communications, Wireless Technologies and HD Experts contain an "Exclusivity" paragraph, which provides:

> Due to the fact that Contractor will have access to Customer Information and other DIRECTV Confidential Information as defined below, during the term of this Agreement, Contractor agrees that neither it, nor its parent entities, subsidiaries or affiliates, shall perform installations or Services for any other provider or distributor of products/services which compete with DIRECTV's programming services or any other DIRECTV product or service within the DMA(s) it is receiving DIRECTV work orders, except as otherwise permitted by DIRECTV. This includes but is not limited to the distribution via DTH/DBS, cable, MMDS, FiOS/IPTV or any and all other technologies and media now existing or hereafter developed.

Doc. No 69 at 43-44, 149-50, 189-90.

As for payment, DIRECTV paid each contractor according to a rate matrix and then each contractor would determine how much to pay its technicians. DIRECTV did not determine how contracting companies or their subcontractors paid technicians – whether hourly or via piece-rate. Roeder was paid by the job during his time with both White Communications and Wireless Technologies. The contractor's name appeared on his paychecks. Grill was also paid by the job and his subcontractor's name appeared on his paychecks. Plaintiffs were paid a set amount for each work order, regardless of the time it took them to complete the order. In the event DIRECTV would determine that the services were not substantially performed pursuant to DIRECTV's standards, it could issue a chargeback to the contractor. It was up to the contractor or subcontractor whether to pass this on to the technician. Grill recalled that he incurred chargebacks of $50 on approximately four occasions.

Roeder testified that during the three years he completed DIRECTV orders, he worked an average of 55 to 60 hours per week and was paid a gross average of $1,200 per week, or approximately $20.00 per hour. He never reported the number of hours

he worked to any employee at DIRECTV, Wireless Technologies or White Communications. Grill alleged in his complaint that he worked approximately 60 hours per week and testified that he worked on average 55 hours per week. He earned an average of $18.18 per hour. DIRECTV did not keep records of the hours the plaintiffs worked.

These facts, and others as appropriate, will be discussed in more detail in analyzing the parties' motions for summary judgment.

## IV. ANALYSIS

Before considering the motions for summary judgment, I must address the related pending motions that impact the scope of the summary judgment record.

### A. DIRECTV's Motion to Strike Statement of Kevin Jackson

DIRECTV filed a motion (Doc. No. 75) to strike a recorded statement of Kevin Jackson[7] (Jackson statement) submitted by plaintiffs in support of their motion for partial summary judgment. DIRECTV also moved to strike any exhibits that were introduced in support of plaintiffs' motion through the Jackson statement and any statements of fact which rely, in full or in part, on the Jackson statement. DIRECTV argues that the Jackson statement is not a deposition, document, electronically stored information, affidavit, declaration, stipulation, admission or interrogatory answer under Federal Rule of Civil Procedure 56(c). To the extent the statement could be considered a document, DIRECTV argues it has not been authenticated as required under Eighth Circuit law. *See Stuart v. Gen. Motors Corp.*, 217 F.3d 621, 635 n.20 (8th Cir. 2000) ("[t]o be considered on summary judgment, documents must be authenticated by and attached to an affidavit made on personal knowledge setting forth such facts as would be admissible in evidence

---

[7] Jackson was a former Cedar Rapids site trainer and general manager for DIRECTV.

or a deposition that meets the requirements of Fed. R. Civ. P. 56(e).").  DIRECTV submits that the signed statement from Jackson, as well as the declarations from members of plaintiffs' counsel's law firm verifying the accuracy of the transcription, are insufficient to transform the statement into a deposition transcript or authenticated declaration.  Thus, DIRECTV argues it should not be considered as it is inadmissible hearsay with no exception.

Plaintiffs characterize this argument as a technical complaint and submit that a recorded declaration from a witness who has attested it is accurate is allowed under Federal Rule of Civil Procedure 56(c)(1)(A).  Plaintiffs note that they only have to present evidence that *could* be admissible at trial, not evidence that *is* admissible in its present form.  *See Gannon Int'l Ltd. v. Blocker*, 684 F.3d 785, 793 (8th Cir. 2012).  Plaintiffs explain that they had intended to depose Jackson, but when they were left without a court reporter they, along with counsel for DIRECTV, agreed to proceed with a videotaped interview, during which DIRECTV's counsel was invited to participate.

Jackson was not sworn at the beginning of the interview but signed a declaration at the end of the interview stating, "under penalty of perjury," that "the answers [he] gave to the questions recorded on that video tape were true and correct."  Later, the video was transcribed by a third-party vendor and both a paralegal and attorney at plaintiffs' counsel's law firm compared this transcript to the video to verify its accuracy.  Plaintiffs therefore argue that Jackson's statement has been authenticated by his own declaration and the declarations of counsel and professional staff.  In any event, they note DIRECTV has not claimed the transcript does not accurately portray Jackson's statements.  Further, plaintiffs maintain that the statement would be admissible under the hearsay exception of recorded recollection or as impeachment evidence.  Finally, plaintiffs point out that many of the statements of fact DIRECTV wants stricken have already been admitted by DIRECTV.

Unsworn statements may not be considered on summary judgment.  *See Risdal v.*

12

*Nixon*, 589 F. App'x 801, 803 (8th Cir. 2014) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 n. 17 (1970)). However, previously unsworn statements may be used if they are subsequently reaffirmed under oath. *See DG&G, Inc. v. FlexSol Packaging Corp. of Pompano Beach*, 576 F.3d 820, 825-26 (8th Cir. 2009) (holding that district court did not abuse its discretion in considering an unsworn expert report accompanied by an affidavit at the summary judgment stage); *Maytag Corp v. Electrolux Home Prods., Inc.*, 448 F. Supp. 2d 1034, 1064 (N.D. Iowa 2006) ("subsequent verification or reaffirmation of an unsworn expert's report, either by affidavit or deposition, allows the court to consider the unsworn expert's report on a motion for summary judgment."). The issue is whether Jackson's statement has been effectively cured by a verification that the answers he provided are true and accurate.

Jackson's statement consists of 59 pages. The final page consists of the following typewritten statement:

> I Kevin Jackson met with attorneys Todd Werts and Andrew Johnson in Cedar Rapids, Iowa on August 2, 2106. That meeting was video-taped.
>
> I declare under penalty of perjury that the answers I gave to the questions recorded on that video tape were true and correct.

Doc. No. 68-2 at 161. The statement also includes a signature for Kevin Jackson and is dated August 2, 2016.

I find that Jackson's unsworn statement is sufficiently cured by the signed verification at the end of the statement, along with the declarations of the transcriber and an attorney and paralegal attesting to the accuracy of the transcript. *See* 28 U.S.C. § 1746 (allowing an unsworn declaration signed under penalty of perjury to serve as a substitute for a sworn statement or affidavit). DIRECTV's motion to strike the Jackson statement is **denied** and that statement will be considered as part of the record for purposes of summary judgment.

**B.** *Plaintiffs' Motion for Leave to File Statements of Additional Facts and Appendices Out of Time*

On September 13, 2016, plaintiffs filed a motion (Doc. No. 83) for leave to file statements of additional facts and appendices out of time. Counsel noted that its resistances to the motions for summary judgment against each plaintiff had been timely filed the day before, on September 12, 2016. However, counsel noted that he was unable to finalize the appendices and statements of additional facts within the deadline due to his busy schedule. Plaintiffs seek to add nine paragraphs of additional facts in resistance to the motion for summary judgment as to Grill and 11 paragraphs of additional facts in resistance to the motion for summary judgment as to Roeder. These additional facts are supported by a 68-page appendix for Grill (Doc. No. 84) and a 70-page appendix for Roeder (Doc. No. 85).

On September 27, 2016, DIRECTV filed a response (Doc. No. 95) to the motion for leave to submit additional statements of facts and appendices out of time, as well as to plaintiffs' separate motion (Doc. No. 78) to file their resistance to DIRECTV's motion to sever out of time (Doc. No. 78).[8] DIRECTV notes this case is one of more than 40 federal lawsuits plaintiffs' counsel has filed against DIRECTV across the country and that plaintiffs' counsel has similarly missed deadlines in those cases. In this case, plaintiffs missed the deadline to respond to the motion to sever by 10 days and filed their motion for leave to file additional statements of facts one day after the deadline. DIRECTV focused primarily on plaintiffs' untimely resistance to its motion to sever.[9]

Plaintiffs filed a reply (Doc. No. 99) on September 29, 2016, explaining that counsel had mistakenly scheduled out-of-town depositions of DIRECTV witnesses in related cases on the same day as the deadline for the resistances to DIRECTV's motions

---

[8] This motion was referred to Chief United States Magistrate Judge C.J. Williams.

[9] Judge Williams granted plaintiffs' motion (Doc. No. 78) for leave to file their resistance to the motion to sever out of time on October 11, 2016. Doc. No. 100.

for summary judgment. Plaintiffs filed their resistances to the motions by the deadline, but had not finalized the statements of facts and appendices by that time. Therefore, they sought leave to file additional statements of facts and appendices two hours after the deadline had passed, attaching the proposed additional statements of facts and appendices to their motion. DIRECTV has responded to these additional statements of facts in its replies. *See* Doc. Nos. 97-2 and 98-2.

Pursuant to the Federal Rules of Civil Procedure, "the court may, for good cause," extend a deadline "on motion made after the time has expired if the parties failed to act because of excusable neglect." Fed. R. Civ. P. 6(b)(1)(B). Excusable neglect is an "elastic concept" and requires the court take into account "all relevant circumstances surrounding the party's omission." *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 392-95 (1993). These circumstances include: (1) the possibility of prejudice to the opposing party, (2) the length of the moving party's delay and the possible impact of that delay on judicial proceedings, (3) the moving party's reasons for delay, including whether the delay was within their reasonable control and (4) whether the moving party acted in good faith. *See Chorosevic v. MetLife Choices*, 600 F.3d 934, 946 (8th Cir. 2010) (citing *Sugarbaker v. SSM Health Care*, 187 F.3d 853, 856 (8th Cir. 1999)).

Here, the possibility of prejudice was minimal, if at all. Indeed, DIRECTV did not allege prejudice as a result of the late filing. As to the length of the delay, it can be measured in hours, not days, and the majority of the resistances were timely filed. Moreover, DIRECTV has responded to the additional facts such that there will be no impact on judicial proceedings. Plaintiffs' counsel indicated the delay was due to being scheduled for out-of-town depositions the same day plaintiffs' resistances to the motions for summary judgment were due. While a busy schedule does not typically constitute excusable neglect, *see Hawks v. J.P. Morgan Chase Bank*, 591 F.3d 1043, 1048 (8th Cir. 2010), it appears plaintiffs' counsel made a good faith effort to file the entire

15

resistance by the deadline, with the additional statements of facts and appendices missing the deadline by only a couple of hours. These additional statements of facts and appendices are limited in number and volume.

Based on the above-described circumstances, I find plaintiffs have demonstrated excusable neglect. Their motion (Doc. No. 83) for leave to file statements of additional facts and appendices out of time is **granted**. I will consider the additional statements of facts and appendices (and, of course, DIRECTV's responses thereto) in considering DIRECTV's motions for summary judgment.

## C. *Motions for Summary Judgment*

DIRECTV has filed separate motions for summary judgment as to each plaintiff and raises the following issues:

1. Whether plaintiffs were properly classified as independent contractors;

2. Whether Grill was jointly employed by DIRECTV;

3. Whether plaintiffs were exempt from overtime under the 7(i) exemption to the FLSA;

4. Whether plaintiffs have adequate evidence regarding DIRECTV's knowledge of any alleged FLSA violations;

5. Whether Roeder's claims are time-barred by the FLSA's statute of limitations; and

6. the sufficiency of plaintiffs' proof of damages.

*See* Doc. Nos. 59-3 at 3-5 and 62-3 at 4-6.

Plaintiffs seek summary judgment in their favor on the first and third issues. They contend the undisputed facts demonstrate an employer-employee relationship between each of them and DIRECTV and that DIRECTV's affirmative defense of an exemption under 7(i) fails as a matter of law. They argue I should rule on liability such that a jury would be required to determine only: (1) the extent of their unpaid work and (2) whether DIRECTV acted in good faith or willfully violated the FLSA.

16

Any party may move for summary judgment regarding all or any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one that "'might affect the outcome of the suit under the governing law.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "the substantive law will identify which facts are material." *Id.* Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.*

An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249-50, does not make an issue of material fact genuine.

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248-49. The party moving for entry of summary judgment bears "the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there

17

is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

In determining if a genuine issue of material fact is present, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996).

On cross motions for summary judgment, the "court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2720 (3d ed. 1998). Because the parties seek summary judgment on some of the same issues, I will consider all the parties' arguments as to each issue, keeping in mind the separate inferences that are to be drawn from each motion. *See Wright v. Keokuk Cnty. Health Ctr.*, 399 F. Supp. 2d 938, 946 (S.D. Iowa 2005).

### 1.    *Were Plaintiffs Properly Classified as Independent Contractors?*

Under the FLSA, only employees are entitled to overtime compensation. *See* 29 U.S.C. § 216(b). Independent contractors do not enjoy the FLSA's protections. The

18

FLSA defines "employee" as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). "Employ" under the FLSA "includes to suffer or permit to work." 29 U.S.C. § 203(g). To determine whether an individual is an employee under the FLSA, the Eighth Circuit uses the "economic realities" test. *See Ash v. Anderson Merchandisers, LLC*, 799 F.3d 957, 961 (8th Cir. 2015); *see also Bartels v. Birmingham*, 332 U.S. 126, 130 (1947) ("employees are those who as a matter of economic reality are dependent upon the business to which they render service"). While the Eighth Circuit has not itemized the factors it considers for this test, other courts generally rely on six factors:[10]

    (a)    the degree of control exercised by the alleged employer;

    (b)    the worker's investment in the business;

    (c)    the degree to which the worker's opportunity for profit and loss is determined by the alleged employer;

    (d)    the skill and initiative in performing the job;

    (e)    the permanency of the relationship; and

    (f)    the extent to which the work is an integral part of the alleged employer's business.

*See Dole v. Amerilink Corp.*, 729 F. Supp. 73, 75-76 (E.D. Mo. 1990) (citing *Sec'y of Labor, United States Dept. of Labor v. Lauritzen*, 835 F.2d 1529, 1535 (7th Cir. 1987)). *See also Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1058-59 (2d Cir. 1988); *Martin v. Selker Bros.*, 949 F.2d 1286, 1293 (3d Cir. 1991); *Schultz v. Capital Intern. Sec., Inc.*, 466 F.3d 298, 304-05 (4th Cir. 2006); *Hopkins v. Cornerstone America*, 545 F.3d 338, 343 (5th Cir. 2008); *Real v. Driscoll Strawberry Assocs., Inc.*, 603 F.2d 748, 754 (9th Cir. 1979); *Barlow v. C.R. England, Inc.*, 703 F.3d 497, 506 (10th Cir. 2012); *Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1312 (11th Cir. 2013). No one factor is controlling and the court must base its decision on the totality of the circumstances. *See Rutherford Food Corp. v. McComb*, 331 U.S. 722, 728 (1947) (noting the employer-

---

[10] These factors are often referred to as the *Silk* factors, as they originated from *United States v. Silk*, 331 U.S. 704, 716 (1947).

employee relationship depends "upon the circumstances of the whole activity"); *see also Brock*, 840 F.2d at 1059. The above list of factors is also not exhaustive. *Id.*

DIRECTV relies on several cases in which courts have determined that cable or satellite television installers are independent contractors under the FLSA. *See Bennett v. UniTek Global Servs., LLC*, No. 10 C 4968, 2013 WL 4804841, at *4-11 (N.D. Ill. Sept. 9, 2013); *Scruggs v. Skylink, Ltd.*, Civil Action No. 3:10-0789, 2011 WL 6026152 (S.D. W. Va. Dec. 2, 2011); *Chao v. Mid-Atlantic Installation Servs., Inc.*, 16 F. App'x 104 (4th Cir. 2001). Of course, for each case DIRECTV cites, plaintiffs cite a case reaching the opposite conclusion (or at least finding a genuine issue of material fact on the issue). *See Keller v. Miri Microsystems LLC*, 781 F.3d 799 (6th Cir. 2015); *Lang v. DirecTV, Inc.*, 801 F. Supp. 2d 532, 534 (E.D. La. 2011); *Perez v. Lantern Light Corp.*, No. C12-01406, 2015 WL 3451268 (W.D. Wash. May 29, 2015).[11] This is hardly surprising

---

[11] The United States District Court for the Eastern District of Missouri recently summarized the varying results around the country as follows:

> Following bench trials, the court in *Solis v. Cascom, Inc.*, 3:09CV257, 2011 WL 10501391, (S.D. Ohio Sept. 21, 2011) held that cable installers were employees under the FLSA, and the court in *Parrilla v. Allcom Const. & Installation Services, LLC*, 6:08–cv–1967–Orl–31GJK, 2009 WL 2868432 (M.D. Fla. Aug. 31, 2009) held that cable installers were independent contractors exempt from the FLSA. Some courts faced with motions for summary judgment on the issue of whether cable installers are employees under the FLSA or independent contractors exempt from the FLSA have found that substantial factual disputes precluded summary judgment. *See Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308 (11th Cir. 2013); *Lang v. DirecTV, Inc.*, 801 F.Supp.2d 532 (E.D. La.2011); *Keeton v. Time Warner Cable, Inc.*, 2:09–CV–1085, 2011 WL 2618926 (S.D. Ohio July 1, 2011); *Muller v. AM Broadband, LLC*, 07–60089–CIV, 2008 WL 708321 (S.D. Fla. March 14, 2008); *Santelices v. Cable Wiring*, 147 F.Supp.2d 1313 (S.D.Fla.2001). Other courts have granted summary judgment finding that cable installers were independent contractors based on the particular facts of those cases. *See Keller v. Miri Microsystems, LLC*, 12–15492, 2014 WL 1118446 (E.D. Mich. March 20, 2014) [*vacated by Keller v. Miri Microsystems LLC*, 781 F.3d

given that the Panel on Multidistrict Litigation denied plaintiffs' motion for consolidation based, in part, on the "individualized inquiry" of whether an individual is an employee or independent contractor for nearly 500 plaintiffs. *See* Doc. No. 17-1. Because this is a fact-intensive "individualized inquiry," the cases cited by the parties have limited value in determining whether there is a genuine issue of material fact as to whether these plaintiffs were employees under the FLSA. Nonetheless, I will compare and contrast the facts in those cases with the facts presented in this case.

"Whether a FLSA plaintiff is an employee is a mixed question of law and fact." *Miri Microsystems LLC*, 781 F.3d at 806. "While the existence and degree of each factor is a question of fact . . . the legal conclusion to be drawn from those facts – whether workers are employees or independent contractors – is a question of law." *Saleem v. Corporate Transp. Group, Ltd.*, 52 F. Supp. 3d 526, 536 (S.D.N.Y. 2014) (internal quotations omitted). "[W]here there is a genuine issue of fact or conflicting inferences can be drawn from the undisputed facts, . . . the question is to be resolved by the finder of fact in accordance with the appropriate rules of law." *Miri Microsystems LLC*, 781 F.3d at 806.

### a. Degree of Control

The first factor is the degree of control an employer has over an alleged employee.

---

799 (6th Cir. 2015)]; *Bennett v. Unitek Global Services, LLC*, 10C4968, 2013 WL 4804841 (N.D. Ill. Sept. 9, 2013); *Scruggs v. Skylink, Ltd.*, 3:10–0789, 2011 WL 6026152 (S.D. W.Va. Dec. 2, 2011); *Chao v. Mid–Atlantic Installation Services, Inc.*, 16 Fed.Appx. 104 (4th Cir. 2001); *Herman v. Mid–Atlantic Installation Services, Inc.*, 164 F. Supp. 2d 667 (D. Md. 2000). It is clear from the foregoing cases that the analysis is fact intensive and each court must make the determination as to the employment relationship on the particular facts before them.

*Thornton v. Mainline Commc'ns, LLC*, 157 F. Supp. 3d 844, 848-49 (E.D. Mo. 2016).

"Control is only significant when it shows an individual exerts such a control over a meaningful part of the business that she stands as a separate economic entity." *Scantland*, 721 F.3d at 1313 (citing *Usery v. Pilgrim Equipment Co., Inc.*, 527 F.2d 1308, 1311-12 (5th Cir. 1976)). DIRECTV argues that the undisputed evidence weighs in favor of finding that Roeder was properly classified as an independent contractor and relies on the following facts:

- Roeder spent the vast majority of his time working independently in the field. Doc. No. 59-1 at ¶ 27.

- Roeder testified that he spent "99 percent" of his time working autonomously and without any supervision from DIRECTV, Wireless Technologies or White Communications. *Id.*

- Roeder testified he only saw his Wireless Technologies supervisor twice in five months and his White Communications supervisor approximately once per day. *Id.* at ¶ 34.

- Roeder did not have to report to anyone at DIRECTV as he completed work orders.[12] *Id.* at ¶ 35.

- Roeder never reported the actual number of hours he worked to any employee of DIRECTV or either subcontractor. *Id.* at ¶ 32.

- Roeder could perform work orders outside his scheduled time slot without consequence.[13] *Id.* at ¶ 31.

---

[12] Roeder denies this fact. *See* Doc. No. 80-2 at ¶ 35. He states that while he testified he did not have to call any particular person at DIRECTV as he completed work orders, he did have to communicate that fact to DIRECTV through the SIEBEL system, which he accessed on a handheld device and later through his mobile phone.

[13] Roeder denies this fact. *See* Doc. No. 80-2 at ¶ 31. He notes that his testimony on this point was that there were no consequences "as long as the customer didn't complain." *See* Doc. No. 59-2 at 121.

22

- Roeder took off time every November to go beaver trapping. *Id.* at ¶ 52.

- Roeder rejected the position of a W-2 employee technician and decided to work as an independent contractor for White Communications.[14] *Id.* at ¶ 22.

Roeder disagrees that the undisputed facts support a finding that he was an independent contractor. Indeed, he argues the undisputed facts establish that DIRECTV did maintain a high degree of control over him, either directly or indirectly. He cites paragraphs 27 through 65 of plaintiffs' statement of undisputed facts (Doc. No. 72) in support. Only the following of those paragraphs are admitted by DIRECTV:

- All DIRECTV work orders must be performed according to the SPIG's specific standards. Doc. No. 87-1 at ¶ 29.[15]

- DIRECTV makes the same training materials available to subcontracting

---

[14] Roeder denies this fact. *See* Doc. No. 80-2 at ¶ 22. He cites his deposition testimony, in which he testified he was presented the option to work either directly for DIRECTV as a W-2 employee or through a subcontractor and could not recall the reason he ended up with White Communications. In any event, I do not find this fact material to the issue of whether DIRECTV exerted a significant degree of control over Roeder.

[15] DIRECTV contends plaintiffs' Exhibit 13 is not authenticated and lacks foundation, such that it is not "competent evidence" for purposes of summary judgment. Plaintiffs' Exhibit 13 appears to be a copy of DIRECTV's 2003 Standard Professional Installation Guidelines (revised on June 3, 2010). Plaintiffs point out in their reply (Doc. No. 91) in support of their motion for partial summary judgment that this document was produced by DIRECTV and used as an exhibit in the deposition of David Baker, an executive of DIRECTV. Plaintiffs' counsel has submitted a declaration stating as such. *See* Doc. No. 68-2 at ¶ 17. "[T]he standard is not whether the evidence at the summary judgment stage would be admissible at trial – it is whether it *could* be presented at trial in an admissible form." *Gannon Int'l Ltd.*, 684 F.3d at 793. Proper foundation and authenticity for this document (and others) could be established if offered at trial through the testimony of the people who created or maintained the documents. DIRECTV's evidentiary objections to documents on these bases (lack of foundation and authenticity) are overruled for purposes of summary judgment.

company principals as it uses with W-2 employee technicians. *Id.* at ¶ 33.[16]

- DIRECTV maintains standards applicable to 1099 technicians on their grooming and appearance. *Id.* at ¶ 36.

- DIRECTV created daily work orders and assigned those work orders to individual technicians, including Plaintiffs. *Id.* at ¶ 37.

- DIRECTV maintained an online scheduling and management system called SIEBEL to schedule, track, and manage all DIRECTV installation work performed by any technician, including Plaintiffs. *Id.* at ¶ 38.

- DIRECTV's SIEBEL system contained a schedule for each technician, including Plaintiffs which was used by DIRECTV's SIEBEL system to randomly soft book work orders to individual technicians. *Id.* at ¶ 39.

- Within DIRECTV's SIEBEL system, the technician's schedule reflects the time period in which a technician may be scheduled to begin a job, not necessarily finish. *Id.* at ¶ 40.

- When 1099 subcontractor technicians like Plaintiffs needed a day off for vacation or being sick, that "exception" was recorded in DIRECTV's SIEBEL system. *Id.* at ¶ 41.

- DIRECTV's subcontracting companies did not have full access to SIEBEL. *Id.* at ¶ 43.

- DIRECTV site manager Jones was ultimately responsible for the work of all the technicians assigned to his site, including 1099 subcontractor technicians like Plaintiffs. *Id.* at ¶ 44.

---

[16] While DIRECTV admits this fact, it argues that Exhibit 19 (a purported copy of the DIRECTV Required Training October 2010 Facilitator Guide) is not authenticated, is dated outside the period of time (June 2009 to June 2010) that Roeder worked for Wireless Technologies, and that the citation to Jackson's statement only applies to Grill, not Roeder. Moreover, it argues that plaintiffs cite to no record evidence that Roeder or Grill ever received any training materials from DIRECTV during their employment with their respective subcontractors. Plaintiffs respond that this document was produced by DIRECTV in related litigation. *See* Doc. No. 91 at 5. They also state it was offered as an example of the training materials DIRECTV provided to subcontractor and W-2 technicians. I will consider this context in my evaluation of this factor.

24

- DIRECTV's SIEBEL system tracks every work order throughout its life-cycle until the work order is either closed or cancelled. *Id.* at ¶ 46.

- Every work order within SIEBEL is associated to a unique technician identification number. *Id.* at ¶ 47.

- All technicians – whether they were W-2 employees or subcontractor technicians – were required to be able to communicate directly with DIRECTV. *Id.* at ¶ 48.

- Plaintiffs were required to notify DIRECTV when they arrived on site at a customer's location; that information was tracked inside DIRECTV's SIEBEL system. *Id.* at ¶ 49.

- DIRECTV site manager Jones would regularly receive reports called the "On-Site AM Report" showing the time that every technician, including both W-2 employees and 1099 contractors, working through his or her site arrived at the first job of the morning and the first job of the afternoon. *Id.* at ¶51.

- For a certain percentage of jobs completed by subcontractor technicians, DIRECTV personnel visited customer locations after work had been done to perform a quality assurance review. *Id.* at ¶ 53.

- DIRECTV customers were only given DIRECTV's central telephone number. *Id.* at ¶ 54.

- The difference between how DIRECTV handles Field Service Requests (FSRs) for W-2 employees and 1099 subcontractors is which supervisor it is initially forwarded to. *Id.* at ¶ 56.[17]

As to Grill, DIRECTV cites the following undisputed facts as demonstrating

---

[17] DIRECTV points out that only Jackson's statement is cited in support of this fact, and therefore, it would not apply to subcontractors who engaged Roeder.

insufficient control to characterize him as an employee:

- Grill worked autonomously in the field unsupervised by anyone. Doc. No. 62-1 at ¶ 33.

- He was not required to check in with a supervisor on a regular basis.[18] *Id.* at ¶ 36.

- On most days, Grill drove from his house to various jobs at customers' homes and then back home at night. *Id.* at ¶ 34.

- He only made occasional visits to the warehouse, going there to pick up supplies once or twice per week.[19] *Id.* at ¶ 35.

- Grill did not receive detailed instruction about how to perform his work and he could control the order and manner in which he completed his work orders.[20] *Id.*

---

[18] Grill denies this statement, citing his own testimony that he did report to a supervisor during the day when he had a problem. *See* Doc. No. 88-1 at ¶ 36.

[19] Grill admits this statement but notes that his testimony indicated his weekly or bi-weekly trips to the warehouse were routine, not "occasional." The word "routine" does not appear in the parts of Grill's deposition cited by plaintiffs. Moreover, the testimony cited by Grill (Doc. No. 88-2 at 29-34) does not describe the nature of Grill's trips to the warehouse. Instead, Grill's precise testimony on this point, as cited by DIRECTV, is as follows:

    Q.     How many days a week did you go to the warehouse?
    A.     Usually at least once a week. A lot of weeks it was twice. And depending on if there was the right equipment available to do the job the way that it said on the -- I'm making another trip. And then – Yeah.
    Q.     Did you try to minimize trips to the warehouse?
    A.     Yes.
    Q.     And did you keep DIRECTV equipment in your garage in an effort to minimize the number of times a week you had to go to the warehouse?
    A.     Yes. Yes.

Doc. No. 62-2 at 65.

[20] Grill denies both of these statements, pointing out that he testified there "were variables" he

at ¶¶ 37, 39.

- He could run personal errands during the day.[21] *Id.* at ¶ 42.

- He arrived at jobs outside the scheduled appointment window without consequence. *Id.* at ¶ 40.

- In his short six-month engagement with U.S. Citadel, he declined to perform a

---

had to deal with such as where to mount the dish and the best way to run the wires. He points out that DIRECTV provided detailed instructions on other aspects of his work including what a technician should do while approaching the worksite, what words to use when talking to the customer, what size drill bit to use when mounting the dish, how much to charge for custom labor work, and what instructions to leave behind with the customers. *See* Doc. No. 72 at ¶ 29. Grill also denies that he could not control the order in which he completed his work. He points out that DIRECTV's paragraph 71 states, "[c]ustomers are booked into an appointment window based on their desired time slot," which suggests Grill did not have control over the order he performed his work. However, Grill also testified that he tried to arrange the work orders in a logical way to minimize his driving and fueling. *See* Doc. No. 62-2 at 55.

[21] Grill denies this statement. His precise testimony on this point, as cited by both plaintiffs and DIRECTV, is as follows:

> Q.   And if you needed to run a personal errand during the day, could you do that?
>
> A.   As long as I was in a position where dispatch knew when I was expected, my customers knew when I was expected. Yeah. Because random tasks had to be done. There had to be gas put in the van, you know. There might be a stop off for a slice of pizza at Casey's or something you know. Other than – you know, other than that, no, there was no going to the mall or spending time doing anything else. I was focused on work and get the – the jobs that DIRECTV was mandating me to have done that day – to get them done, to the best of my ability.
>
> Q.   If you needed to run into the grocery store for something, could you do that?
>
> A.   I don't think you had anything in place that would deny someone from doing that.

Doc. No. 62-2 at 78.

work order without consequence when there was inclement weather.[22]  *Id.* at ¶ 43.

- He never received any discipline and never had a performance review.[23]  *Id.* at ¶¶ 44-45.

- In Grill's own words, this "wasn't that kind of job where . . . you need supervision."  *Id.* at ¶ 36.

Plaintiffs also argue that the degree of control cannot be compared between DIRECTV and the subcontractor.  They contend the court must consider the "degree of the control that the alleged employer has in comparison to the control exerted by the worker."  *See Schultz*, 466 F.3d at 305.  To be clear, this means I must consider the degree of control DIRECTV had over Roeder and Grill, not the degree of control DIRECTV had over the subcontractors or the degree of control the subcontractors had over Roeder and Grill.

The material undisputed and disputed facts on this factor can be summarized as follows:

---

[22] Grill denies this statement.  Grill's precise testimony on this point, as cited by both plaintiffs and DIRECTV, is as follows:

> Q.    So if there was a thunderstorm, would you be the one that would decide "This is crazy.  I'm not going to install this satellite dish," or would somebody tell you not to?
> A.    I would have somebody tell me not to, after assessing the situation – and myself first.  I guess I would never make the final decision on this job is not getting done.

Doc. No. 62-2 at 70.

[23] Grill denies that he never had a performance review.  He cites to his deposition testimony in which he testified "Rich" was on-site watching him perform his work orders on two specific occasions.  Doc. No. 62-2 at 38.  In the testimony cited by DIRECTV, Grill testified that someone reviewed his performance metrics with him only during training and no one ever talked to him about what percentage of SIN7s (Service within 7) he had or what percentage of receivers were successfully connected to the Internet.  Doc. No. 62-2 at 60-61.

28

| Plaintiff Roeder | |
|---|---|
| **Undisputed Facts** | **Disputed Facts** |
| *From DIRECTV* | |
| Roeder spent the vast majority of his time working independently in the field | |
| Roeder testified that he spent "99 percent" of his time working autonomously and without any supervision from DIRECTV, Wireless Technologies or White Communications | |
| Roeder did not have to report to anyone at DIRECTV as he completed work orders | |
| Roeder never reported the actual number of hours he worked to any employee of DIRECTV or either subcontractor | |
| Roeder took off time every November to go beaver trapping | |

| Plaintiff Grill | |
|---|---|
| **Undisputed Facts** | **Disputed Facts** |
| *From DIRECTV* | *Disputed by Grill* |
| Grill worked autonomously in the field unsupervised by anyone | Grill could control the order and manner in which he completed his work orders |
| He was not required to check in with a supervisor on a regular basis | He could run personal errands during the day |
| On most days, Grill drove from his house to various jobs at customers' homes and then back home at night | In his short six-month engagement with US Citadel, he declined to perform a work order without consequence when there was inclement weather |
| He only made occasional visits to the warehouse, going there to pick up supplies once or twice per week | He never received any discipline and never had a performance review |
| He arrived at jobs outside the scheduled appointment window without consequence | |
| In Grill's own words, this "wasn't that kind of job where . . . you need supervision." | |

29

| Both Plaintiffs | |
|---|---|
| **Undisputed Facts** | **Disputed Facts** |
| *From Plaintiffs* | *Disputed by DIRECTV* |
| All DIRECTV work orders must be performed according to the SPIG's specific standards | DIRECTV had the authority to prohibit Plaintiffs or any subcontractor technician from continuing to receive work orders because of performance or disciplinary issues. Doc. No. 76-2 at ¶ 27. |
| DIRECTV makes the same training materials available to subcontracting company principals as it uses with W-2 employee technicians | DIRECTV promulgated mandatory rules policies, and practices regarding the manner and method by which installations were to be performed, which are summarized in DIRECTV's SPIG. *Id.* at ¶ 28. |
| DIRECTV maintains standards applicable to 1099 technicians on their grooming and appearance | Plaintiffs were prohibited from deviating from DIRECTV's written standards in performing their work without DIRECTV's prior written approval. *Id.* at ¶ 30. |
| DIRECTV created daily work orders and assigned those work orders to individual technicians, including plaintiffs | Plaintiffs were required to use only tools and supplies that were approved by DIRECTV. *Id.* at ¶ 31. |
| DIRECTV maintained an online scheduling and management system called SIEBEL to schedule, track, and manage all DIRECTV installation work performed by any technician, including plaintiffs | DIRECTV maintained ongoing written communication with subcontractors by distributing Blast Facts and Tech Tips to the subcontracting company leads, which contained updates on DIRECTV's policies and procedures. *Id.* at ¶ 32. |
| DIRECTV's SIEBEL system contained a schedule for each technician, including Plaintiffs which was used by DIRECTV's SIEBEL system to randomly soft book work orders to individual technicians | If a subcontractor did not timely acquire the DIRECTV-required training certifications, DIRECTV's site manager Chet Jones would not allow him to work in his market. *Id.* at ¶ 34. |
| Within DIRECTV's SIEBEL system, the technician's schedule reflects the time period in which a technician may be scheduled to begin a job, not necessarily finish | DIRECTV required all technicians, including plaintiffs, to wear a DIRECTV uniform, drive a DIRECTV-branded vehicle, and display DIRECTV-marked credentials. *Id.* at ¶ 35. |
| When 1099 subcontractor technicians like | If a work order assigned to a subcontractor |

Case 5:14-cv-04091-LTS   Document 108   Filed 01/13/17   Page 30 of 71

| | |
|---|---|
| Plaintiffs needed a day off for vacation or being sick, that "exception" was recorded in DIRECTV's SIEBEL system | technician needed to be reassigned to another technician, the subcontracting supervisor had to call or email DIRECTV to request the reassignment. *Id.* at ¶ 42. |
| DIRECTV's subcontracting companies did not have full access to SIEBEL | DIRECTV site managers discussed individual technician performance with subcontracting company managers in order to effect behavioral changes within the 1099 subcontractor workforce. *Id.* at ¶ 45. |
| DIRECTV site manager Jones was ultimately responsible for the work of all the technicians assigned to his site, including 1099 subcontractor technicians like plaintiffs | DIRECTV personnel monitored plaintiffs' work. *Id.* at ¶ 50. |
| DIRECTV's SIEBEL system tracks every work order throughout its life-cycle until the work order is either closed or cancelled | At least weekly, DIRECTV site managers would receive a report showing the total amount of time that DIRECTV expected every technician, including both W-2 employees and 1099 contractors, to be inside DIRECTV customers' homes during a particular day (though site manager could pull this report themselves at any time). *Id.* at ¶ 52. |
| Every work order within SIEBEL is associated to a unique technician identification number | If a DIRECTV customer calls into DIRECTV's customer service center and asks for a concern to be addressed, the local site receives a FSR. *Id.* at ¶ 55. |
| All technicians – whether they were W-2 employees or subcontractor technicians – were required to be able to communicate directly with DIRECTV | DIRECTV used post-installation customer surveys to rate plaintiffs' work as it related to customer experience in the same manner it rated the work of its W-2 technicians. *Id.* at ¶ 57. |
| Plaintiffs were required to notify DIRECTV when they arrived on site at a customer's location; that information was tracked inside DIRECTV's SIEBEL system | DIRECTV site managers used reports called technician report cards to identify particular technicians, including 1099 subcontractor technicians, who were having issues with properly completing their work. *Id.* at ¶ 58. |
| DIRECTV site manager Jones would | Subcontracting companies are provided |

31

| | |
|---|---|
| regularly receive reports called the "On-Site AM Report" showing the time that every technician, including both W-2 employees and 1099 contractors, working through his or her site arrived at the first job of the morning and the first job of the afternoon | the technician report card weekly and its contents are discussed with the applicable DIRECTV site manager. *Id.* at ¶ 59. |
| For a certain percentage of jobs completed by subcontractor technicians, DIRECTV personnel visited customer locations after work had been done to perform a quality assurance review | DIRETV measured plaintiffs' work performance against metrics it developed and circulated reports identifying low-performing technicians. *Id.* at ¶ 60. |
| DIRECTV customers were only given DIRECTV's central telephone number | DIRECTV held regular meetings with subcontractor principals regarding bottom-performing technicians. *Id.* at ¶ 61. |
| The difference between how DIRECTV handles FSRs for W-2 employees and 1099 subcontractors is which supervisor it is initially forwarded to | Once a month, subcontracting company technicians, like plaintiffs, had to gather all of the DIRECTV-issued equipment so that DIRECTV personnel could perform an inventory of that equipment. *Id.* at ¶ 62. |

Similar circumstances have led some courts to find that the workers were independent contractors. *See Freund v. Hi-Tech Satellite, Inc.*, 185 F. App'x 782, 783 (11th Cir. 2006) (per curiam) (affirming the district court's finding that plaintiff was independent contractor where plaintiff had to wear certain shirts during appointments, follow certain specifications for installations and call the satellite company to confirm installation and report any problems); *Dole*, 729 F. Supp. at 76-77 (concluding cable television installers were independent contractors based, in part, on fact that cable provider exercised no control over manner in which installers performed their tasks, the hours they worked, or the number of jobs they performed, and that quality controls and requirement of wearing a generic "cable television" insignia on their shirts did not amount to degree of control to make installers employees).

32

Other courts have found a genuine issue of material fact under similar circumstances. *See Pennington v. Integrity Commc'ns, Inc.*, No. 1:12CV5SNLJ, 2014 WL 2106301, at *5 (E.D. Mo. May 20, 2014) (noting the parties told "a very different story as to how much control defendants exercised over plaintiffs' work" and that the court could not make credibility and factual determinations on a summary judgment motion); *Lang*, 801 F. Supp. 2d at 537 (finding material facts in dispute included whether defendants threatened to fire technicians who did not work evening shifts, whether plaintiffs received DIRECTV's Blast Facts and other memoranda, the degree of discretion plaintiffs retained in performing their jobs, and whether plaintiffs were "charged back" more than they earned on particular jobs). In some of these cases, the defendant was the contracting company while in others it was the cable provider. Regardless, the analysis is the same and, in this case, applies only to DIRECTV's actions and not those of Wireless Technologies, White Communications, U.S. Citadel or HD Experts.

Essentially, DIRECTV's position is that any "control" it had over plaintiffs was for purposes of efficiency, consistency and quality control. Plaintiffs argue this same evidence suggests a level of control by DIRECTV that made them employees rather than independent contractors. Some courts have found that "[r]equiring installers to meet installation specifications for a customer, and to provide periodic updates on an order's status, 'is entirely consistent with the standard role of a contractor who is hired to perform highly technical duties.'" *See Scruggs*, 2011 WL 6026152, at *3 (quoting *Herman v. Mid-Atlantic Installation Servs., Inc.*, 164 F. Supp. 2d 667, 671 (D. Md. 2000)). Other courts have not. *See Scantland*, 721 F.3d at 1315 (finding that defendant's quality control measures were one of numerous indicia of control that strongly suggested an employee-employer relationship).

Clearly, not all facts related to this factor, or the inferences to be drawn from them, are undisputed. "[W]here there is a genuine issue of fact or conflicting inferences can be drawn from the undisputed facts, . . . the question is to be resolved by the finder

33

of fact in accordance with the appropriate rules of law." *Miri Microsystems LLC*, 781 F.3d at 806 (quoting *Lilley v. BTM Corp.*, 958 F.2d 746, 750 n.1 (6th Cir. 1992)). When viewing the facts in the light most favorable to plaintiffs for purposes of DIRECTV's motions for summary judgment, I find a reasonable jury could find in favor of plaintiffs on this factor. When viewing the facts in the light most favorable to DIRECTV for purposes of plaintiffs' motion for summary judgment, I find a reasonable jury could find in favor of DIRECTV on this factor. Therefore, I find a genuine issue of material fact as to the "degree of control" factor. Because the economic reality test is multi-factored, I will consider the other factors to determine whether summary judgment is appropriate in favor of either party.

### b. Worker's Investment

The second factor considers the amount the worker has invested in the business. The worker's investment must be compared to that of the alleged employer. *Dole v. Snell*, 875 F.2d 802, 810 (10th Cir. 1989). DIRECTV contends the following undisputed facts demonstrate that Roeder made a significant investment in the tools, equipment, materials and other items he needed to perform DIRECTV work such that this factor weighs in favor of finding that Roeder was an independent contractor:

- Roeder purchased a $20,000 Ford pickup truck, which he used when performing DIRECTV orders.[24] Doc. No. 59-1 at ¶ 36.

- He owned the cellphone and computer he used to retrieve work orders. *Id.* at ¶ 41.

- Roeder spent $2,000 on the equipment he used to perform installations for both White Communications and Wireless Technologies. *Id.* at ¶ 38.

---

[24] Roeder notes that he had the Ford pickup before he started doing DIRECTV work. *See* Doc. No. 80-2 at ¶ 36.

34

- He retained discretion to purchase this equipment from any seller he chose. *Id.* at ¶ 39.

- Roeder took itemized tax deductions for his equipment when reporting to the IRS that he operated a business.[25] *Id.* at ¶ 42-43.

As to Grill, DIRECTV contends the following undisputed facts demonstrate Grill also made a significant investment, which weighs in favor of a finding that he was an independent contractor:

- Throughout his relationship with U.S. Citadel, Grill made a significant personal investment in his business, including the purchase of his own tools, equipment, and materials and the use of his own vehicle and computers.[26] Doc. No. 62-1 at ¶ 65.

- He never sought reimbursement for these expenses, instead taking tax deductions for them when reporting to the IRS that he was operating a business. *Id.* at ¶ 67.

DIRECTV cites three unpublished cases in support of its argument that these facts are sufficient to establish "independent contractor" status. *See Krupicki v. Eagle One, Inc.*, No. 4:12-cv-00150, 2014 U.S. Dist. LEXIS 46038, at *15-16 (E.D. Ark. Apr. 3, 2014) (finding plaintiff's responsibility to provide own truck or van and specialty tools weighed in favor of plaintiff being an independent contractor); *Scruggs*, 2011 WL 6026152, at *6 (finding this factor weighed in favor of independent contractor status when plaintiffs were responsible for providing their own work equipment and vehicles and had retained other individuals to assist them in providing installation services); *Chao*, 16 F. App'x 104, at *3 (finding that this factor weighed in favor of independent contractor status when plaintiffs were required to supply their own trucks (equipped with 28-foot

---

[25] Roeder denies that he reported to the IRS that he operated a business by merely reporting his 1099 income. *See* Doc. No. 80-2 at ¶ 42.

[26] As to this statement of fact, Grill admits only that he had to purchase the equipment described in order to perform his DIRECTV work orders. He denies that these constituted a "substantial investment." *See* Doc. No. 79-2 at ¶ 65.

35

ladders), specialized tools, uniforms, and pagers and had the right to employ their own workers).

Plaintiffs argue these cases are inapposite. In both *Scruggs* and *Chao*, the court considered whether the installers were employees of subcontracting companies, not the cable provider. Moreover, the courts noted that the plaintiffs were themselves subcontractors who paid technician employees and had to manage the overhead costs of their businesses. The facts in this case, as applied to each plaintiff, are substantially different. Both Roeder and Grill purchased equipment they used to perform DIRECTV installation services. They deducted these purchases as business expenses on their tax returns. Roeder spent approximately $2,000 on equipment while Grill was not asked how much he spent. *See* Doc. No. 62-2 at 51-55, 83. Grill deducted $5,280 in vehicle expenses and $488 in supplies on his tax return the year he performed DIRECTV work. Doc. No. 79-2 at ¶ 67.

Essentially, these are the only facts DIRECTV has offered in support of this factor, aside from the purchase of a vehicle. In *Krupicki*, 2014 U.S. Dist. LEXIS 46038, at *15-18, the court relied on the worker's purchase of a 2003 Chevrolet Express Van and lease of a Bush Truck to conclude that his investments weighed in favor of independent contractor status. While it is not clear whether the worker could have used those vehicles for other purposes, they were purchased so he could make deliveries. *Id.*

Here, I do not find the plaintiffs' purchase and/or use of personal vehicles to weigh in favor of finding plaintiffs were independent contractors. Both vehicles had been purchased prior to taking DIRECTV work orders and the record does not establish plaintiffs purchased them solely for the purpose of performing DIRECTV work. *See Herman v. Express Sixty-Minutes Delivery Serv., Inc.*, 161 F.3d 299, 304 (5th Cir. 1998) ("investment of a vehicle is no small matter, [but] that investment is somewhat diluted when one considers that the vehicle is also used by most drivers for personal purposes."). The same analysis applies with regard to plaintiffs' cell phones and computers. *See Miri*

36

*Microsystems LLC*, 781 F.3d at 811.

With regard to the investment factor, I find that the undisputed facts do not weigh in favor of either independent contractor or employee status. While each plaintiff did spend money on tools and equipment, these "investments" pale in comparison to investments in other cases, where courts found this factor weighed in favor of independent contractor status. *See Krupicki*, 2014 U.S. Dist. LEXIS 46038, at *15-16, *Scruggs*, 2011 WL 6026152, at *6; *Chao*, 16 F. App'x at *3. Therefore, I find a genuine issue of material fact as to the "investments" factor.

### c. Degree to Which The Worker's Opportunity for Profit and Loss is Determined by The Alleged Employer

The third factor considers "the alleged employee's opportunity for profit or loss depending on his managerial skill." *Scantland*, 721 F.3d at 1316. It also considers "whether the worker or the alleged employer controlled the major determinants of the amount of profit which the [worker] could make." *Eberline v. Media Net, L.L.C.*, 636 F. App'x 225, 228 (5th Cir. 2016) (citing *Hopkins*, 545 F.3d at 343). DIRECTV cites the following undisputed facts as to Roeder, which it argues weigh in favor of independent contractor status:

- Roeder admitted in his deposition he would "try and pick up additional income." Doc. No. 59-1 at ¶ 49.

- One of the ways he earned additional income was by performing installation work for DIRECTV's competitor, Dish Network. *Id.* at ¶ 45.

- Roeder offered custom labor work to customers, such as pole mounts and wall fishes, which were not part of the DIRECTV work order. He would negotiate the price for this work directly with the customer[27] and the customer would pay him with cash or check. *Id.* at ¶ 50.

---

[27] Roeder notes in his statement of additional facts that DIRECTV set the upper bound of the rates that he could charge a customer for custom labor. *See* Doc. No. 97-2 at ¶ 10.

37

- Roeder performed carpentry work and pre-wired in houses. *Id.* at ¶ 46.

- In 2012, less than 30 percent of the revenue Roeder reported to the IRS was from his work for White Communications. *Id.* at ¶ 48.

- Roeder was able to control his profit by choosing the most affordable liability insurance and choosing the order in which he performed his work so as to reduce mileage between jobs.[28] *Id.* at ¶ 51.

As for Grill, DIRECTV cites the following undisputed facts, which it argues weigh in favor of independent contractor status:

- Grill attempted to minimize his expenses by arranging work orders to minimize mileage and fuel costs. Doc. No. 62-1 at ¶ 68.

- Grill admitted to shopping around to find the best price on tools and equipment.[29]

- Grill decided whether he wanted to obtain additional work orders to complete during the day.[30]

---

[28] Roeder denies his testimony as to these choices supports an argument that he was attempting to maximize profits. *See* Doc. No. 80-2 at 20.

[29] While cited in its brief, DIRECTV failed to include this fact in its statement of undisputed facts. Nonetheless, the record indicates it would likely be considered undisputed as Grill admitted he had the option of shopping around to try and find the best price for specialized technical equipment. *See* Doc. No. 62-2 at 54.

[30] DIRECTV failed to include this fact in its statement of undisputed facts. It is unclear whether Grill would dispute this fact or not. Grill testified as follows when asked about additional work orders:

    Q.    Were there ever days where you were able to pick up additional work orders because you finished your work orders early?
    A.    Not very often.
    Q.    Did that happen sometimes?
    A.    I -- I believe I do recall one time where I happened to be done and I called Rich to see if anybody maybe needed help or –

38

- Grill stored his equipment in his garage to limit his commute to the warehouse.[31]

- By ensuring his work met DIRECTV's technical specifications, so as to avoid chargebacks, Grill was increasing his profits.[32]

With regard to Roeder, I find that this factor does not weigh in favor of either independent contractor or employee status, as conflicting inferences can be drawn from the undisputed facts. Some of those facts are certainly suggestive of independent contractor work. Roeder performed satellite installation work for a DIRECTV competitor and performed custom work for DIRECTV customers, for which he was paid directly. *See Chao*, 16 F. App'x at 107 (finding that this factor weighed in favor of independent contractor status where installer's net profit or loss depended on skill in meeting specifications to avoid chargebacks, business acumen in selecting tools and equipment, and decision whether to hire his own employees or work alone). However, the record also demonstrates that DIRECTV exercised control over the amount Roeder could charge customers for his custom work by capping the price.

With regard to the other facts (Roeder's carpentry work and the reported revenue to the IRS), I do not find these facts particularly persuasive of independent contractor

---

Q. Did you get an additional work order to do?
A. I don't remember the outcome. I don't remember.

Doc. No. 62-2 at 76-77.

[31] DIRECTV failed to include this fact in its statement of undisputed facts. However, it appears to be undisputed as Grill testified he kept DIRECTV equipment in his garage in an effort to minimize the number of times a week he had to go to the warehouse. *See* Doc. No. 62-2 at 65.

[32] DIRECTV failed to include this fact in its statement of undisputed facts. Moreover, the cited portion of the record contains no reference to chargebacks or quality control inspections. It is unclear whether Grill would dispute this purported fact. Grill's only testimony involving chargebacks was that he received chargebacks on four occasions for approximately $50 on average, but he could not recall what they were for or how they were justified. *See* Doc. No. 62-2 at 51; Doc. No. 88-1 at ¶ 59.

status. Nothing in the record indicates these were part of Roeder's DIRECTV work. The relevant inquiry is how much of Roeder's opportunity for profit and loss in performing his DIRECTV work was controlled by DIRECTV or influenced by Roeder's managerial skill. *See Scantland*, 721 F.3d at 1316-17 (noting plaintiffs' ability to earn additional income through their own initiative was limited because they could not charge more for the work they were doing or offer non-[cable] services to customers).

Also, it appears the plaintiffs never incurred losses or risked incurring losses in performing DIRECTV work. The record indicates plaintiffs were paid piece-rate, meaning they were paid a specified amount for a job regardless of how long it took to complete. While this would suggest plaintiffs may have been able to take on additional work orders (and increase profits) by working efficiently, the record indicates this opportunity rarely presented itself. *See* Doc. No. 59-2 at 100 (in which Roeder is asked if he could earn more by completing more work orders, but his answer has been left out of the record); Doc. No. 62-2 at 76-77 (in which Grill testifies that he can recall only one occasion in which he completed a job early and asked his supervisor if anyone needed help, but could not recall whether he received an additional work order). To the extent the opportunity did arise, this was based on technical skill and efficiency, not on managerial skill. *See Scantland*, 721 F.3d at 1316. For these reasons, I find that the undisputed facts do not weigh in favor of either independent contractor or employee status as to Roeder when applying the appropriate inferences in favor of each resisting party.

With regard to Grill, I find the evidence is insufficient to demonstrate he had an opportunity to control profit or loss while performing his DIRECTV work. Many of the facts DIRECTV cites are incidental (minimizing mileage and fuel costs and finding the best price for tools and equipment) and do not demonstrate an ability to control profits or loss as to the actual work being performed. I also do not find DIRECTV's argument persuasive that Grill was "maximizing profits" by avoiding chargebacks. While the record for Roeder's claim suggests Grill may have had the same opportunities to offer

custom work, Grill denied that he ever performed custom work.  *See* Doc. No. 62-2 at 85-86 ("Q.  Was there ever a time when you were completing DIRECTV work orders where a customer would pay you extra to do things like pole mounts or wall fish or custom wiring?  A.  No.  Q.  Did customers ever tip you?  A.  No.  Q.  Did customers ever give you any money at all?  A.  No.").  Plaintiffs also note Grill's testimony that he would not have tried to take on other jobs or sources of income because he was "exhausted" and "didn't have any time."  Doc. No. 88-1 at 27.[33]  Finally, the same reasoning with regard to pay and the ability (or inability) to pick up additional work orders as described above applies to Grill as well.  He was not able to exercise managerial skill to increase his profits in this position.  For these reasons, I find this factor weighs in favor of employee status as to Grill when applying the appropriate inferences in favor of each resisting party.

### d.     Skill and Initiative in Performing the Job

In considering this factor, I must determine whether plaintiffs' profits increased because of the "initiative, judgment or foresight of the typical independent contractor," or whether their work "was more like piecework."  *Miri Microsystems LLC*, 781 F.3d at 809 (quoting *Rutherford Food Corp.*, 331 U.S. at 730).  With regard to this factor, DIRECTV argues the following facts weigh in favor of independent contractor status:

- Roeder completed satellite technician tests and obtained SBCA Installer Certification.  Doc. No. 59-1 at ¶ 55.

- Roeder admitted he used his skills as a carpenter when installing and mounting satellite dishes.[34]  *Id.* at ¶ 59.

---

[33] The cited testimony from Grill is not a part of the record and therefore, cannot be considered.

[34] Roeder testified that his carpentry skills did not add much to his job as a DIRECTV installer.

41

Case 5:14-cv-04091-LTS   Document 108   Filed 01/13/17   Page 41 of 71

custom work, Grill denied that he ever performed custom work.  *See* Doc. No. 62-2 at 85-86 ("Q.  Was there ever a time when you were completing DIRECTV work orders where a customer would pay you extra to do things like pole mounts or wall fish or custom wiring?  A.  No.  Q.  Did customers ever tip you?  A.  No.  Q.  Did customers ever give you any money at all?  A.  No.").  Plaintiffs also note Grill's testimony that he would not have tried to take on other jobs or sources of income because he was "exhausted" and "didn't have any time."  Doc. No. 88-1 at 27.[33]  Finally, the same reasoning with regard to pay and the ability (or inability) to pick up additional work orders as described above applies to Grill as well.  He was not able to exercise managerial skill to increase his profits in this position.  For these reasons, I find this factor weighs in favor of employee status as to Grill when applying the appropriate inferences in favor of each resisting party.

### d.     Skill and Initiative in Performing the Job

In considering this factor, I must determine whether plaintiffs' profits increased because of the "initiative, judgment or foresight of the typical independent contractor," or whether their work "was more like piecework."  *Miri Microsystems LLC*, 781 F.3d at 809 (quoting *Rutherford Food Corp.*, 331 U.S. at 730).  With regard to this factor, DIRECTV argues the following facts weigh in favor of independent contractor status:

- Roeder completed satellite technician tests and obtained SBCA Installer Certification.  Doc. No. 59-1 at ¶ 55.

- Roeder admitted he used his skills as a carpenter when installing and mounting satellite dishes.[34]  *Id.* at ¶ 59.

---

[33] The cited testimony from Grill is not a part of the record and therefore, cannot be considered.

[34] Roeder testified that his carpentry skills did not add much to his job as a DIRECTV installer.

41

Case 5:14-cv-04091-LTS   Document 108   Filed 01/13/17   Page 41 of 71

- Each installation presented a different scenario such that Roeder had to assess how to complete the installation without any step-by-step instructions.[35] *Id.* at ¶ 54.

- Roeder acknowledged that installing satellite television services is a complicated process that goes beyond simply aligning satellite receivers with the satellite itself. *Id.* at ¶ 53.

With regard to Grill, DIRECTV argues the following facts weigh in favor of independent contractor status:

- Grill admitted during his deposition that properly installing DIRECTV systems is complicated and cannot be done without training. Doc. No. 62-1 at ¶ 49.

- Grill received training from U.S. Citadel, which included classroom instruction and approximately two weeks of "shadowing" another U.S. Citadel technician.[36] *Id.* at ¶ 30.

- Grill obtained SBCA certification, which required passing a written test. *Id.* at ¶ 50.

- Grill did not receive detailed instructions on the installation of DIRECTV satellite

_____

*See* Doc. No. 80-3 at 23 ("Q. Is it fair to say that your carpentry past and your skills made you more efficient at doing work orders than you otherwise would have been? A. No.").

[35] Roeder denies this statement. He testified there were not step-by-step instructions "of how you do each individual job." *See* Doc. No. 80-3 at 55. Moreover, he points out that DIRECTV provides very detailed instructions on how it wants its technicians to perform their work, including what a technician should do while approaching the worksite, what words to use when talking to the customer, what size drill bit to use when mounting the dish, how much to charge for custom labor work, and what instructions to leave behind with customers. *See* Doc. No. 68-1 at ¶ 29.

[36] Grill points out that DIRECTV is the company that drafts, publishes, and distributes the training used to educate technicians. *See* Doc. No. 79-2 at ¶ 51. Grill cites Jackson's statement that the DIRECTV training materials are provided to subcontracting companies through satinstalltraining.com, a website run by DIRECTV. *See* Doc. No. 79-3 at 64-65.

services, but exercised his own judgment in deciding the best way to complete each installation job.[37]  *Id.* at ¶ 37.

Plaintiffs maintain that their work did not require a special skill that required them to exercise their own judgment.  *See In re McAtee*, 126 B.R. 568, 572 (N.D. Iowa 1991) ("[A] special skill pertains to services which are outside the ordinary course of the [alleged employer's] business or beyond the training capabilities of the employer."). However, they acknowledge that they did acquire some skills because they were required to complete training and their skills were verified through a test administered by DIRECTV.  Workers in skilled trades are traditionally considered independent contractors.  *See Scruggs*, 2011 WL 6026152, at *7.  However, the relevant inquiry is whether Roeder and Grill could use their skills to increase their business.  In *Roslov v. DirecTV, Inc.*, the court found this factor weighed in favor of independent contractor status when the technician had to follow standards in performing installations, but could negotiate directly with customers regarding compensation for custom work he could perform.  *Roslov v. DirecTV, Inc.*, No. 4:14-CV-00616 BSM, 2016 WL 6892110, at *9 (E.D. Ark. Nov. 4, 2016).  Here, the undisputed facts establish that Roeder occasionally performed custom work for DIRECTV customers, for which he was paid directly.  Even

---

[37] Grill denies this statement as not accurately portraying his testimony.  *See* Doc. No. 79-2 at ¶ 37.  The cited testimony is:

> Q.  Is it fair to say that you didn't have step-by-step instructions as to how to complete each work order?
> A.  Yeah.  Yep.
> Q.  You had to figure out some things like where the best place was to mount the satellite dish?
> A.  There were variables, yes.
> Q.  And what the best way was to run the wires, that type of thing?
> A.  Yes.

Doc. No. 62-2 at 102.  Grill argues there is ample evidence in the record regarding the detailed instructions DIRECTV provides on how it wanted technicians to perform their work.  *See supra* n. 35 (citing Doc. No. 68-1 at ¶ 29).

43

though Roeder contends he did not have any special skills, he did have training for those skills and took initiative in using them to increase his profits. He also admitted to using his judgment in deciding whether to charge a customer for custom labor at all. *See* Doc. No. 97-2 at ¶ 11. I find this to be characteristic of an independent contractor rather than an employee, even when viewing the facts in the light most favorable to Roeder.

There is no evidence in the record that Grill took similar initiative or used his skills in this way to increase profits. Indeed, Grill described his work as strictly piece work. *See* Doc. No. 62-2 at 64 ("Q. My question was the amount got paid for a specific job like you – in your example you said the guy told you this is a $100 job. That job was a $100 job whether it took you guys 30 minutes to do it or whether it took you four hours to do it; is that right? A. Yeah. Yes.") In *Perez*, the court found that the installation work was "piece work" that did not require initiative, judgment or foresight. *See Perez*, 2015 WL 3451268 at *15. It noted that while installer efficiency was a metric measured by DIRECTV, the initiative, judgment or foresight of a given installer "found scant necessity within the four corners of the work order." *Id.* Here, Jackson stated that, to his knowledge, the subcontracting companies paid the technicians piece-rate, but admitted that he had never seen their checks. Doc. No. 79-3 at 66. He also noted that DIRECTV's W-2 production technicians were paid piece-rate.

In the context of truck driving, the Eighth Circuit has found it noteworthy that while a certain degree of skill is required to drive a tractor-trailer, "that skill was not unique and not more prevalent among independent contractors than employees." *See Northland Cas. Co. v. Meeks*, 540 F.3d 869, 873 (8th Cir. 2008). The same logic applies here. While Grill was performing skilled work, he was not using those skills any differently than a DIRECTV employee. He also did not exercise any judgment or initiative with regard to those skills to increase his profits. For these reasons, this factor weighs in favor of employment status as to Grill.

44

### e.    Permanency

The fifth factor considers whether the worker and alleged employer regard the work as permanent.  "If a worker has multiple jobs for different companies, then that weighs in favor of finding that the worker is an independent contractor."  *Miri Microsystems LLC*, 781 F.3d at 807.  "The more permanent the relationship, the more likely the worker is to be an employee."  *Schultz*, 466 F.3d at 309.  "Generally, independent contractors have variable or impermanent working relationships with the principal company because they 'often have fixed employment periods and transfer from place to place as particular work is offered to them, whereas "employees" usually work for only one employer and such relationship is continuous and indefinite in duration.'" *Miri Microsystems LLC*, 781 F.3d at 807.

With regard to this factor, DIRECTV argues the following facts weigh in favor of finding Roeder was an independent contractor:

- Roeder did not have a contract with DIRECTV.

- Roeder rejected the opportunity to become a W-2 technician for DIRECTV.[38] Doc. No. 59-1 at ¶ 22.

- The only entities Roeder had a contractual relationship with were Wireless Technologies and White Communications.  *Id.* at ¶¶ 18, 25.

- Roeder did not exclusively perform DIRECTV work orders, and to the contrary, performed work for a DIRECTV competitor.  *Id.* at ¶ 45.

- Roeder freely took time off work to trap beavers.  *Id.* at ¶ 52.

- Roeder's relationship with Wireless Technologies was short – lasting approximately 9 months, with a 3-month break in his engagement.  *Id.* at ¶¶ 7, 20.

---

[38] Roeder denies that he "rejected" the offer.  *See* Doc. No. 89-1 at ¶ 22.  He testified that he was presented the option to work as a DIRECTV W-2 employee or through a subcontractor and did not recall the reason he ended up with White Communications.  *See* Doc. No. 80-3 at 34-35.

45

- Roeder's first engagement with White Communications lasted approximately 6 months. *Id.* at ¶ 9.

- Roeder's second engagement with White Communications lasted approximately 8 months, and included a four-week break to trap beavers in Woodbury County during hunting season. *Id.* at ¶¶ 9, 52.

- Roeder voluntarily ended his engagements with Wireless Technologies and White Communications on his own terms and at the times of his choosing, specifically after he decided to no longer work in South Dakota and again after he decided to start his own satellite installation company.[39] *Id.* at ¶ 26.

With regard to Grill, DIRECTV argues the following facts demonstrate he was an independent contractor:

- Grill had no contract or employment agreement with DIRECTV.

- Grill performed DIRECTV work orders for only six months. Doc. No. 62-1 at ¶ 20.

- Grill ended his engagement with U.S. Citadel in the fall of 2011 after he decided to stop installing DIRECTV systems to avoid working outside in the winter weather.[40] *Id.* at ¶ 21.

---

[39] Roeder denies that his company, CJ Satellite Services, is a comparable installation company. His company is a "retailer" in that it sells satellite subscription services for both DIRECTV and Dish Network. *See* Doc. No. 89-1 at ¶ 26.

[40] The cited testimony does not support this fact. Grill testified as follows:

> Q.  And why did you stop installing DIRECTV equipment?
> A.  After consideration and deciding that some – some of the main factors were it wasn't paying enough to make it worthwhile, with all the extra things that weren't included on this but were expected of me. My own vehicle and gas and buying my own cable and the hours and storing all the receivers and dishes in my garage and dealing with the cleanup and the paperwork. And it didn't supply enough income for what the job required.

46

I find the undisputed facts related to this factor weigh in favor of independent contractor status as to Roeder. He performed work for other companies, including a DIRECTV competitor. He also took long breaks, which is not typical of an employment arrangement. These factors suggest that Roeder did not have a permanent relationship with DIRECTV, but one where he could choose to receive work from DIRECTV as he saw fit. The only evidence Roeder offers regarding permanency is the fact that he performed DIRECTV work for nearly two years (without counting breaks). Even when viewing the facts in the light most favorable to Roeder, I find that this factor weighs in favor of independent contractor status.

As to Grill, his employment was short in duration. However, "even short, exclusive relationships between the worker and the company may be indicative of an employer-employee relationship." *Miri Microsystems LLC*, 781 F.3d at 807. There is nothing to suggest that Grill did not treat his employment as anything other than permanent while he was doing DIRECTV work. While there is some disagreement as to whether he quit due to pay or the weather, I do not find this fact material given that Grill did not resume work at a later date (as Roeder did). Grill's conduct is no different than that of an employee. Even when viewing the facts in the light most favorable to DIRECTV, I find this factor weighs in favor of employee status.

---

Q.    So you were unhappy with the pay?
A.    Overall, unhappy with the pay and then I knew – you know, when you're pushing the end of August, middle of August, you know in Iowa that winter is coming, and it – I couldn't use my garage for all of DIRECTV's equipment that they required me to have. I needed my space in the garage. I knew that I – the pay wasn't going to cover putting a ladder in the – in a 3-foot snowdrift.

Doc. No. 62-2 at 35-36.

47

###### f. Whether The Work is an Integral Part of The Business

The last factor considers whether the work is an integral part of the alleged employer's business. "The more integral the worker's services are to the business, then the more likely it is that the parties have an employer-employee relationship." *Miri Microsystems LLC*, 781 F.3d at 815. DIRECTV does not address this factor. It appears to be undisputed that plaintiffs played an integral role in DIRECTV's business by installing DIRECTV systems for customers. Indeed, DIRECTV admits that its technicians (whether W-2 or 1099) are often the only DIRECTV representatives to have direct and personal contact with its customers. *See* Doc. No. 87-1 at ¶ 3. This factor weighs in favor of an employment relationship, even when viewing the facts in the light most favorable to DIRECTV.

###### g. Other Factors

Plaintiffs contend I should consider the following additional factors in determining whether they are entitled to summary judgment on the issue of whether they were employees:

- DIRECTV employed W-2 workers to perform the same work as plaintiffs

- DIRECTV set and enforced prerequisites for hiring and had the authority to terminate plaintiff's employment

- DIRECTV promulgated work rules, scheduled assignments, set conditions of employment and method of compensation

- DIRECTV was heavily involved in the day-to-day supervision of plaintiffs, including disciplinary decisions

- Personnel records were primarily maintained by DIRECTV

While the *Silk* factors considered above are not exhaustive, s*ee Thornton*, 157 F. Supp. 3d at 848, all but one of the additional factors plaintiffs cite are part of the analysis of

48

whether an entity is a joint employer.  *See Bonnette v. California Health and Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983).  This is separate from the analysis of whether the plaintiffs were employees or independent contractors.  *See Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61, 67-68 (2d Cir. 2003).  For the reasons described *infra*, in Section IV(C)(2), I find that an analysis of the joint employment factors is not necessary as to Grill.  I will, however, consider the first additional factor listed by plaintiffs (similarities between plaintiffs and W-2 technicians) in determining whether the undisputed facts demonstrate that the plaintiffs were employees.  Plaintiffs cite the following facts concerning the similarity between DIRECTV's W-2 employees and the plaintiffs:

- The contracts between the three subcontracting companies at issue in this case and DIRECTV are virtually identical.  Doc. No. 72 at ¶ 82.

- Even though multiple subcontracting companies might be assigned to a particular DIRECTV site, they were each held to the same standards as DIRECTV's W-2 technicians.[41]  *Id.* at ¶ 83.

- By assigning the work, DIRECTV controls schedules of its W-2 technicians and the 1099 subcontractor technicians in the same way.[42]  *Id.* at ¶ 84.

---

[41] DIRECTV clarifies that Jones testified he held all of the technicians who worked out of his site "accountable," and, for technicians engaged by subcontracting companies, he testified that he would talk to their "boss."  Doc. No. 87-1 at ¶ 83.

[42] DIRECTV disputes this fact.  It contends Jackson only stated that DIRECTV's SIEBEL system preliminarily assigned work orders to individual technicians and that the citations to his statement do not pertain to assignments or schedules.  *See* Doc. No. 87-1 at ¶ 84.  His testimony was as follows:

Q.    Would you agree with me that the SIEBEL system or later FS Scheduler would assign and track the jobs that were assigned to particular technicians?
A.    Yes.

49

- Scheduling exceptions for technicians were recorded and tracked in SIEBEL the same way regardless of whether it was for a DIRECTV W-2 employee or a 1099 subcontractor.[43]  *Id.* at ¶ 85.

- Technicians classified as subcontractors were held to the same performance metrics as were DIRECTV W-2 technicians.[44]  *Id.* at ¶ 86.

- There were no differences in the way DIRECTV reviewed technicians' work whether the work was performed by a W-2 employee or a 1099 subcontractor.[45]  *Id.* at ¶ 87.

---

Doc. No. 72-1 at 122.  Jackson then described how 1099 technicians and W-2 technicians would request time off work.  W-2 technicians were required to give two weeks' notice for vacation.  If they needed sick leave, they were required to call in.  Jackson stated that with respect to sick leave, he asked the same thing of subcontracting companies.  However, when a subcontractor had a sick technician, he wanted another subcontractor technician to cover.  If either a 1099 technician or W-2 technician simply needed the day off, it would be entered in as an exception in the system.  *Id.*  DIRECTV maintains that Jackson's statement should not apply to the subcontractors that engaged Roeder because Jackson was the site manager of the Cedar Rapids site, with which only Grill was affiliated.

[43] DIRECTV disputes this fact based on Roeder's testimony that the subcontractor he worked for allowed technicians without DIRECTV-issued technician numbers to perform DIRECTV work orders.  This does not constitute a genuine dispute of fact.

[44] DIRECTV disputes this fact.  The cited testimony states the following:

Q.  To your knowledge, was there any difference in how a site's metrics were measured depending on whether the work had been done by a W-2 employee or a technician engaged through a subcontracting company?
A.  The performance metrics, the best I can remember, were the same.
Q.  Where there ever any differences in those performance metrics?
A.  I don't recall.

Doc. No. 72-1 at 96.  DIRECTV also argues that this testimony cannot apply to Grill because DiPalma never had responsibility over the Cedar Rapids site.

[45] DIRECTV disputes this fact.  Jackson stated: "With W-2 jobs there's a lot more of I'm going

- When DIRECTV followed up with customers on the work of 1099 subcontractor technicians through its post-call survey, the questions that were asked and the metrics by which success was measured were the same as for W-2 employees. *Id.* at ¶ 88.

- DIRECTV site managers had access to the same reporting information about their W-2 employee technician workforce as they did for their 1099 subcontractor workforce.[46] *Id.* at ¶ 89.

- DIRECTV's SIEBEL system did not differentiate between in-house W-2 employee technicians and subcontractor technicians when assigning work orders. *Id.* at ¶ 69.

Plaintiffs argue the similarities between 1099 and W-2 technicians suggest that they should be characterized as employees. *See Tobin v. Anthony-Williams Mfg. Co.*, 196 F.2d 547, 550 (8th Cir. 1952) (holding that plaintiffs were employees based, in part, that "[a]dmitted employees perform[ed] identical work."). In *Tobin*, the alleged employer was a corporation engaged in the production and sale of lumber. It paid truck drivers or haulers at a certain rate per thousand board-feet hauled, depending on the length of the haul. *Tobin*, 196 F.2d at 548. The haulers were required to purchase their trucks from the employer, which they could only use for business purposes. They also had to hire their own wood workers to cut the timber. Defendant admittedly employed individuals who loaded trucks as well as at least two employees who did the same work as the haulers. *Id.* at 549. The work was limited by the amount of work done by the employee loaders and defendant's storage capacity for logs. *Id.*

---

to help you. There's assistance provided, teaching, and things like that. The 1099's we weren't to teach, we weren't to really . . . I mean, we might tell them whether they pass or fail and explain why. But it wasn't now we are going to offer you a consequence or anything. That was up to their supervisor." Doc. No. 72-1 at 105. DIRECTV also notes, again, that Jackson's statement cannot apply to Roeder.

[46] DIRECTV disputes this fact. It points out Jackson only stated that he received "technician score cards" for the W-2 and 1099 technicians based out of his site. *See* Doc. No. 72-1 at 119.

51

DIRECTV attempts to distinguish *Tobin* by arguing there is no evidence in the record that plaintiffs' work was limited in any way by any DIRECTV employee, but only by "their own free will in deciding how hard, and how much, they worked, and by the cyclical demand for DIRECTV services." Doc. No. 87 at 12, n.7. I disagree that the record establishes plaintiffs' work was limited only by their "own free will." *See* Doc. No. 62-2 at 54 (in which Grill testified he was given 4 to 6 work orders per day); Doc. No. 59-2 at 83-84 (in which Roeder testified that at Wireless Technologies the supervisor handed out the route and at White Communications the supervisor would divide out the work orders among technicians); Doc. No. 59-2 at 100 (in which Roeder is asked if he could earn more by completing more work orders, but his answer has been left out of the record); Doc. No. 62-2 at 76-77 (in which Grill testifies that he can recall only one occasion where he got done early and asked his supervisor if anyone needed help, but could not recall whether he received an additional work order).

While DIRECTV disputes many of the above-listed facts, I find that it has not demonstrated *genuine* issues of material fact as to this factor. Indeed, in many instances DIRECTV chose to deny the fact without pointing to evidence supporting the denial. I find the similarities between DIRECTV's W-2 employees and its 1099 technicians in the work they perform, the way their schedules are maintained, the way work orders are assigned and the standards by which they are measured weighs in favor of finding that plaintiffs were employees, rather than independent contractors, even when viewing the facts in the light most favorable to DIRECTV.

### h.  *Conclusion Regarding Independent Contractor or Employee Status*

In sum, I find that the following factors weigh in favor of concluding Roeder was an independent contractor: the skill and initiative in performing the work and the permanence of the relationship. The factors that weigh in favor of concluding he was an

52

employee are: being an integral part of the business and the similarities between DIRECTV's W-2 workers and plaintiffs. The opportunity for profit or loss factor could go either way.

As to Grill, I find that none of the factors weigh in favor of concluding he was an independent contractor. As to both plaintiffs, the degree of control factor has disputed facts and the worker investment factor could lead a jury to conclude that plaintiffs were either employees or independent contractors.

Thus, while Grill seems to have the better argument for "employee" status, neither plaintiff has established, as a matter of law, that he was an employee of DIRECTV rather than an independent contractor. Nor has DIRECTV established, as a matter of law, that the plaintiffs were correctly classified as independent contractors. With regard to both plaintiffs, the jury must consider and weigh the facts relevant to each factor and reach its own conclusion, as the finder of fact, as to whether they were employees or independent contractors.

### 2.    Was Grill Jointly Employed By DIRECTV?

DIRECTV argues that even if Grill is able to show he was an employee, he cannot demonstrate that DIRECTV was his employer. DIRECTV instead insists that I must first determine whether Grill was an employee of U.S. Citadel. If I conclude he was, DIRECTV argues that I must then consider whether DIRECTV is a joint employer by applying the four *Bonnette* factors.

I do not agree that this is the proper legal framework. First, Grill has not named U.S. Citadel as a defendant in this lawsuit. Grill only alleges that he was an employee of DIRECTV. The cases DIRECTV relies on involve both the cable provider *and* the cable installation or contracting companies as defendants. *See Herman*, 164 F. Supp. 2d at 677 (concluding installation company could not be considered installers' employer so neither could cable provider); *Thornton v. Charter Commc'ns, LLC*, No.

53

4:12CV479SNLJ, 2014 WL 4794320, at *10, n.8 (E.D. Mo. Sept. 25, 2014) (assuming the technicians were employees of co-defendant Mainline (a contracting company) and noting that in similar cases where plaintiffs sue both the cable provider and contracting company, district courts have concluded the cable provider is not a joint employer).

Second, plaintiffs have not admitted that their contracting companies were their "employers." DIRECTV provided supplement authority, *Roslov*, 2016 WL 6892110, at *1, in which the plaintiffs sued the same DIRECTV entities. The court in *Roslov* assumed that the service providers were plaintiffs' employers and analyzed only whether DIRECTV was a joint employer, not whether plaintiffs were employees or independent contractors. The court noted:

> It is unclear whether [plaintiff] believes DirecTV is a joint employer or simply misclassified him as an independent contractor. In his complaint, he acknowledges that Service Providers hire technicians, suggesting the Service Providers are an employer and that DirecTV must be a joint employer . . . , but now references independent contractors.

*Roslov*, 2016 WL 6892110, at *6. The court went on to analyze whether DIRECTV was a joint employer based on the assumption that the Service Providers were plaintiff's employer. That assumption is not appropriate here, as DIRECTV and Grill agree that "[b]etween March 2011 and August 2011, Grill was engaged as an independent contractor by US Citadel." Doc. No. 88-1 at ¶ 20. For these reasons, I will not consider whether DIRECTV was a "joint employer" of Grill.

### 3. Are Plaintiffs Exempt From Overtime Under The 7(i) Exemption?

Section 7(i) of the FLSA provides the following exemption from the overtime requirements:

> No employer shall be deemed to have violated subsection (a) by employing any employee of a retail or service establishment for a workweek in excess of [40 hours], if, (1) the regular rate of pay of such employee is in excess of one and one-half times the minimum hourly rate applicable to him under section 206 of this title, and (2) more than half his compensation for a

54

representative period (not less than one month) represents commissions on goods or services.

29 U.S.C. § 207(i). Therefore, there are three elements DIRECTV must prove for this exemption to apply: (1) the employer is a "retail or service establishment;" (2) more than half the employee's compensation for the representative period is from commissions; and (3) the employee's regular rate of pay is at least one and one-half times the minimum wage. *See Reich v. Delcorp, Inc.*, 3 F.3d 1181, 1182 (8th Cir. 1993). Plaintiffs and DIRECTV both seek summary judgment on this exemption.

The application of an exemption is a mixed question of law and fact. *See Grage v. Northern States Power Co.-Minnesota*, 813 F.3d 1051, 1054 (8th Cir. 2015). "The question of how the [workers] spent their working time . . . is a question of fact. The question whether their particular activities excluded them from the overtime benefits of the FLSA is a question of law." *Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 558 (2d Cir. 2012) (quoting *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986)). "Exemptions under the FLSA are to be narrowly construed against the employers seeking to assert them." *Lederman v. Frontier Fire Protection, Inc.*, 685 F.3d 1151, 1157-58 (10th Cir. 2012).

### a.    Is DIRECTV a Retail or Service Establishment?

Plaintiffs argue they are entitled to summary judgment based solely on DIRECTV's inability to prove plaintiffs worked for a "retail establishment." While they do not concede the other two factors that make up the exemption, they contend summary judgment may be granted based on the first factor. DIRECTV argues it is entitled to summary judgment on this factor and urge me to follow the reasoning in *Matrai v. DirecTV, LLC*, 168 F. Supp. 3d 1347, 1359 (D. Kan. 2016). In that case, the court began its analysis of whether DIRECTV was a "retail or service establishment" by citing Department of Labor (DOL) regulations that define a retail or service establishment as

55

"an establishment 75 per centum of whose annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry." *See Matrai*, 168 F. Supp. 3d at 1359 (quoting 29 C.F.R. § 779.411). The court considered other relevant factors, as set forth in DOL regulations and relevant case law, and found that DIRECTV qualified as a retail or service establishment based on the following facts:

- It sells an everyday service delivered through sophisticated equipment installed in the retail consumers' homes.

- DIRECTV sells its services to the ultimate customers, and the equipment is installed and serviced in the customers' homes, which they do not resell.

- Plaintiffs were completing work orders for the installation of satellite television equipment purchased in a retail transaction.

- Consumers had purchased installation services as part of a retail package of equipment and services.

- Plaintiffs were providing installation and repair services in connection with a retail product for the comfort, convenience and enjoyment of the retail purchasers.

*Id.* at 1359-62.

Both parties acknowledge that I am bound by the Eighth Circuit's definition of "retail or service establishment" in *Reich v. Delcorp, Inc.*, which is based on 29 U.S.C. § 213(a)(2). This definition is identical to the definition provided in 29 C.F.R. § 779.411. *See Reich*, 3 F.3d at 1183 (relying on § 213(a)(2), which defines "retail or service establishment" as "an establishment 75 per centum of whose annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry."). Based on this definition, DIRECTV argues the facts in *Matrai* are identical to the facts in this case. It is undisputed that DIRECTV provides satellite television service to the general public and that well over 75 percent of

56

DIRECTV's revenue comes from the sale of goods and services to end users. *See* Doc. No. 88-1 at ¶ 1. Plaintiffs, however, dispute that the sale of DIRECTV services and the technicians' work constitute "retail services" in the cable and satellite television industry. *Id.* at ¶ 4.

First, plaintiffs contend DIRECTV relies on inadmissible evidence to establish this point. DIRECTV cites the declaration of Steven Hill, the Deputy Executive Director of the Satellite Broadcast and Communications Association, a national trade organization, which states:

> Sales and services that are generally recognized as "retail" in our industry include the retail sales of satellite service and equipment by the satellite company (here, DIRECTV) to consumers through retail outlets (*i.e.*, online, telephonic call center facilities, or brick and mortar locations), and the services performed by technicians to fulfill the retail transaction between the Satellite Service and the Consumer by delivering, installing, or servicing the equipment purchased or leased by the customer, and activating or maintaining the customer's connection to the satellite company's satellite television service.

Doc. No. 62-2 at 238. Plaintiffs argue I should disregard Hill's statement because DIRECTV did not disclose Hill as a witness in its Rule 26 disclosures. DIRECTV disagrees and notes that its disclosures, which were served May 19, 2016, identified the following documents: "The depositions transcripts from depositions taken, and the documents produced, and the pleadings and declaration filed in the *Arnold v. DIRECTV, Lang v. DIRECTV, Arndt v. DIRECTV, Field v. DIRECTV*, and all other cases brought by Plaintiffs' counsel against DIRECTV." Doc. No. 98-3 at 13. The caption for the Hill declaration indicates it was part of the *Arnold* lawsuit. Doc. No. 62-2 at 237. I reject plaintiffs' argument that an alleged failure to disclose this declaration renders it inadmissible for summary judgment purposes.

Plaintiffs also dispute that their work constitutes "retail services" in the cable and satellite television industry based on declarations from other executives in the field. They cite deposition testimony from Dan Yannantuono, the Chief Executive Officer of

57

DIRECTV Home Service Provider DirectSat, who states he has never heard of his business as being a retail service and he has never referred to his business as a retail business. *See* Doc. No. 88-1 at ¶ 4. They also cite deposition testimony from J. Mitchell Clarke, the Executive Vice President of DIRECTV's Home Service Provider Multiband, who testified he did not consider Multiband to be a retail business. *Id.* DIRECTV argues these statements do not create a genuine issue of material fact because the executives were only asked about their businesses, DirectSat and Multiband, and not DIRECTV.

Finally, plaintiffs argue that the "establishments" for which plaintiffs worked did not have a retail concept. They rely on *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490 (1945), for the proposition that even if a company's enterprise is retail in nature, only those employees who work in a retail "establishment" qualify for the exemption. In *A.H. Phillips*, the employer corporation operated a chain of 49 retail grocery stores. *A.H. Phillips, Inc.*, 324 U.S. at 491. It also maintained a separate warehouse and office building where the plaintiff employees worked. The court noted that all of the sales were made exclusively at the retail stores and no deliveries to customers were made from the warehouse. *Id.* at 492. The Court reasoned that Congress did not intend to exempt the warehouse and central office of an interstate chain store system as a "retail establishment" under Section 13(a)(2).[47] It concluded that employees working at the warehouse and central office were performing wholesale duties and did not fall within the Section 13(a)(2) exemption. *Id.* at 498.

---

[47] Section 13(a)(2) was intended to exempt "those regularly engaged in local retailing activities and those employed by small local retail establishments, epitomized by the corner grocery, the drug store and the department store." *A.H. Phillips, Inc.*, 324 U.S. at 497. Congress "felt that retail concerns of this nature d[id] not sufficiently influence the stream of interstate commerce to warrant imposing the wage and hour requirements on them." *Id.* While this section was repealed in 1989, it did not change § 207(i)'s use of "retail or service establishment" and reliance on the same definition. *See Reich*, 3 F.3d at 1183.

Plaintiffs argue they are similar to the warehouse workers in *A.H. Phillips* because they worked only through DIRECTV's warehouse facilities, which were not open to the general public and were considered "cost centers" rather than "revenue centers" by DIRECTV.[48] They also contend the DIRECTV sites never received money from DIRECTV's customers and were not set up to do so.

DIRECTV cites numerous cases in which courts have concluded cable companies are "retail or service establishments" under the 7(i) exemption. *See Jones v. Tucker Commcn's, Inc.*, Civil Action No. 5:11-CV-398 (MTT), 2013 WL 6072966, at *5-9 (M.D. Ga. Nov. 18, 2013); *Moore v. Advanced Cable Contractors, Inc.*, Civil Action No. 1:12-CV-00115-RWS, 2013 WL 3991966, at *3 (N.D. Ga. Aug. 1, 2013); *Owopetu v. Nationwide CATV Auditing Servs., Inc.*, No. 5:10-CV-18, 2011 WL 4433159, at *3-7 (D. Vt. Sept. 21, 2011). DIRECTV also argues that plaintiffs' reliance on *A.H. Phillips* is misplaced, as the warehouse workers in that case were undisputedly engaged in wholesale, not retail services, which the Court found significant. Additionally, DIRECTV argues the unavailability of its warehouses to the general public is insignificant. *See* 29 C.F.R. § 779.319 ("[a]n establishment, however, does not have to be actually frequented by the general public in the sense that the public must actually visit it and make purchases of goods or services on the premises in order to be considered as available and open to the general public."). The regulation provides an example that a refrigerator repair service shop is considered available and open to the general public even if it receives all of its orders by telephone and performs all of its repair services on the premises of its customers. *Id*. DIRECTV also references *English v. EcoLab, Inc.*, No. 06 Civ. 5672(PAC), 2008 WL 878456, at *9-10 (S.D.N.Y. Mar. 31, 2008), in

---

[48] DIRECTV disputes this fact. Doc. No. 87-1 at ¶ 95. It notes that this is simply Jackson's opinion, rather than a fact, and that plaintiffs have cited no record evidence regarding the Sioux Falls site.

which the court found service specialists who were stationed out of their homes were available to the public and were, therefore, employees of an "establishment."

Having considered these arguments and authorities, I find the undisputed facts demonstrate that DIRECTV is a "retail and service establishment" as the Eighth Circuit defined that term in *Reich*. It is undisputed that the goods and services provided by DIRECTV are not for resale because they are provided to end user customers in their homes. *See* Doc. No. 88-1 at ¶ 1. The second part of the analysis requires DIRECTV to prove that its business is recognized as retail in the industry. This involves a two-prong inquiry of whether (1) the establishment is part of an industry in which there is a "retail concept" and (2) the establishment's services are recognized as retail in that particular industry. *Id.* at 436.

With regard to whether DIRECTV has a "retail concept," I find persuasive the reasoning of those cases that have concluded cable installers (*i.e.*, contracting companies) have a retail concept. *See Jones v. Tucker Commcn's, Inc.*, 2013 WL 6072966, at *5-9; *Moore*, 2013 WL 3991966, at *3; *Owopetu*, 2011 WL 4433159, at *3-7; *Johnson v. Wave Comm GR LLC*, 4 F. Supp. 3d 423, 447-30 (N.D.N.Y. 2014); *Matrai*, 168 F. Supp. 3d at 1361-62. These cases focus on whether the establishment "sells goods or services to the general public" and "serves the everyday needs of the community in which it is located." *See* 29 C.F.R. § 779.318(a). If this definition applies to the contracting companies, then it certainly applies to the cable provider that supplies the ultimate product being purchased.

With regard to whether DIRECTV's business is recognized as "retail" in the industry, I also find no genuine issue of material fact. While plaintiffs have submitted testimony from executives of two of DIRECTV's home service providers that they do not consider their businesses to be "retail," I find this is not sufficient to generate a genuine issue of material fact as to whether DIRECTV's business is recognized as "retail" in the industry. The executives were only asked about their businesses and not

60

DIRECTV's business. Even when viewing the facts in the light most favorable to plaintiffs, there is no evidence in the record upon which a jury could rely to conclude that DIRECTV is not recognized in the industry as "retail." The declaration submitted by DIRECTV from the Deputy Executive Director of the Satellite Broadcast and Communications Association, a national trade organization, is sufficient to establish this prong. For these reasons, I find the undisputed facts demonstrate that DIRECTV is a retail and service establishment for purposes of the 7(i) exemption.

### b. Was More Than Half of Plaintiffs' Pay Commissions?

"Commission" is not defined in the FLSA. However, some courts rely on the following three factors:

> (1) the employee's compensation must be tied to customer demand or the quantity of sales; (2) the compensation plan must provide performance-based incentives for the employee to increase his or her income; and (3) there must be proportionality between the value of the goods or services sold and the rate paid to the employee.

*Johnson*, 4 F. Supp. 3d at 442. As noted above, plaintiffs testified they were paid on a piece-rate basis. DIRECTV relies on *Alvarado* and *Matrai* to argue that plaintiffs received commission-based payment. In *Alvarado*, the plaintiffs were window washers who were paid on a piece-rate basis pursuant to a collective bargaining agreement. *Alvarado v. Corporate Cleaning Servs. Inc.*, 782 F.3d 365, 367 (7th Cir. 2015). The court reasoned that this was a commission system because the window washers were paid only if there was a sale. *Id.* The court found that in a true piece-rate system, a worker would be paid per item produced, even if there was no sale. *Id.* The court also found that the compensation paid to each worker was proportional and correlated to the price charged to the customer. *Id.* at 368. For each window washing job, a certain number of points was assigned based on the job's complexity and the estimated number of hours it would take to complete it. *Id.* at 367. Workers were then paid by the number of points

61

allocated to them multiplied by a rate specific to each worker. *Id.* The company also used the number of points assigned to a job to determine the price to charge customers. *Id.* The company would also make price adjustments, such as adding costs of permits and equipment rentals, rounding the price to the nearest $24 increment, or reducing the price to remain competitive. *Id.* Finally, the *Alvarado* court found the irregular work hours to be indicative of a commission-based payment system. *Id.* at 368.

The *Matrai* court relied on *Alvarado* and concluded that a commission system is one that pays employees upon a sale, at a rate that is related to the price of the sale, and for work involving irregular hours. *Matrai*, 168 F. Supp. 3d at 1364. It found that all three indicators in that case had been met as to plaintiffs who installed DIRECTV systems. It reasoned that the plaintiffs' compensation fluctuated with the value of the services they performed and additional products they sold, that the rate of pay did not depend on the time it took to complete the work orders, that they could earn more by completing more jobs in a day and that they worked irregular hours. *Id.* at 1364-65.

Here, Grill admitted he was paid based on the work orders he completed. Doc. No. 62-2 at 23-24. He also admitted that work orders were generated based on customer orders for DIRECTV service. *Id.* at 101. He was paid a certain amount for a basic job and received additional pay for installation of additional receivers. *Id.* at 20. The amount he was paid did not depend on how long it took him to complete the work order. *Id.* at 64. Similarly, Roeder testified he was paid based on the work orders he closed. Doc. No. 59-2 at 34. Roeder also was not paid differently depending on how long it took him to complete an order. *Id.* at 100.[49]

---

[49] DIRECTV asserts that Roeder also admitted he was paid more for jobs that involved installing multiple receivers and that he earned additional money for work orders if he performed custom labor or sold the DIRECTV Protection Plan to customers. *See* Doc. No. 59-3 at 22. Roeder

Plaintiffs argue their pay was not commission-based because it was not proportional to the costs to the consumer. *See Parker v. NutriSystem, Inc.*, 620 F.3d 274, 283 (3d Cir. 2010) ("We conclude that when the flat-rate payments made to an employee based on that employee's sales are proportionally related to the charges passed on to the consumer, the payments can be considered a bona fide commission rate for the purposes of § 7(i)."). DIRECTV argues that the installation is one step in the retail transaction of selling DIRECTV services and is offset by the revenue DIRECTV receives for monthly subscriptions and other fees paid by the customer. DIRECTV also relies on *Matrai*'s reasoning that when technicians are paid a base amount for a work order and are paid extra for installing additional receivers, the rate of pay received by the technician is related to the price of the sale to the customer. *See Matrai*, 168 F. Supp. 3d at 1364. While the record in *Matrai* may have supported that position, DIRECTV has not pointed to anything in this record demonstrating plaintiffs' compensation was related in any way to the price paid by the customer. The fact that plaintiffs were paid more for a work order that included additional receivers says nothing about the charges passed on to the customer. Indeed, DIRECTV has not offered any evidence regarding how customers were charged for specific services performed by plaintiffs. *Compare Alvarado*, 782 F.3d at 366-67 (describing the company's use of a point system to calculate both the sales price and the compensation paid).

"The hallmark of a commission-based system is the decoupling of payment from actual time worked." *Almanzar v. C & I Assocs., Inc.*, 175 F. Supp. 3d 270, 275

---

testified that he was paid directly for his custom work, so that cannot be considered commission-based. The other facts are not supported by the record as cited. *See* Doc. No. 59-2 at 73-74 (discussing whether Roeder filled in dollar amounts for work orders he completed, in which he testified he was not sure); *see also id.* at 13, 64-65, 107-08 (acknowledging he sometimes charged customers extra for custom labor, but as to the protection plan it was his understanding that he had to meet a quota or DIRECTV would stop assigning him work orders). Roeder did not testify that he earned additional money if he sold the protection plan.

63

(S.D.N.Y. 2016). When payment is not based on time worked, it presumably incentivizes the employee to complete work efficiently so he or she may take on additional work and earn more. The court in *Matrai* relied heavily on this factor, noting that the more jobs plaintiffs completed in a day, the more they were paid. *Matrai*, 168 F. Supp. 3d at 1365. While the plaintiffs in that case were expected to handle at least three jobs a day, they handled more jobs on some days and less on others. *Id*. Here, both plaintiffs testified they were paid a set amount for a work order regardless of how long it took them to complete it. However, the idea that they could earn more if they worked efficiently is not supported by the record. *See* Doc. No. 59-2 at 100 (in which Roeder is asked if he could earn more by completing more work orders, but his answer has been left out of the record); Doc. No. 62-2 at 76-77 (in which Grill testifies that he can recall only one occasion where he got done early and asked his supervisor if anyone needed help, but could not recall whether he received an additional work order). I also do not find *Matrai* persuasive on this point, as it is not clear from the court's opinion whether the fluctuation in hours and work orders was based on plaintiffs' efficiency or customer demand.

I find that DIRECTV has not met its burden of showing, as a matter of law, that more than half of plaintiffs' compensation was based on commissions. Plaintiffs had no involvement in the sales aspect through which DIRECTV work orders were generated. While plaintiffs were paid the same amount for a job regardless of how quickly they completed the work, there is no evidence that this incentivized them to work efficiently so that they could receive additional work orders and earn more. Finally, there is insufficient evidence of any proportionality between the prices paid by DIRECTV customers and the compensation paid to plaintiffs.

64

### c. *Was Plaintiffs' Regular Rate of Pay At Least One and One-Half Times the Minimum Wage?*

The third requirement for the 7(i) exemption is that the employee's regular rate of pay is at least one and one-half times the minimum wage. The regular rate of pay is calculated by "the rate per hour, computed for the particular workweek by a mathematical computation in which hours worked are divided into straight-time earnings for such hours to obtain the statutory regular rate." 29 C.F.R. § 779.419. DIRECTV argues that plaintiffs' own testimony establishes they were paid more than one and one-half times the applicable minimum wage. It is undisputed that at all relevant times, the federal minimum wage was $7.25 per hour. *See* 29 U.S.C. § 206. Grill admitted that he earned an average of $18.18 per hour. *See* Doc. No. 62-2 at 44-45 (stating that his paycheck was approximately $1,000 per week and he worked approximately 55 hours each week). Roeder admitted that he earned an average of $20 per hour. *See* Doc. No. 59-2 at 104 (stating that on average he earned $1,200 per week and worked 55 to 60 hours).

Plaintiffs argue that DIRECTV cannot establish this element because it did not track plaintiffs' pay or hours worked. *See* Doc. No. 62-1 at ¶ 63 ("DIRECTV did not have any role in deciding how or how much contracting companies and their subcontractor paid their technicians . . . .").[50] They also argue that relying on plaintiffs' generalized testimony regarding gross pay is insufficient because it does not establish plaintiffs' actual compensation after being subjected to chargebacks and unreimbursed business expenses. Finally, plaintiffs argue that pursuant to *Johnson*, DIRECTV cannot meet its burden under § 207(i) by using the average hours reported by plaintiffs. In *Johnson*, the court held that estimated hours provided by the plaintiffs in interrogatory answers could not be used to determine compensation because the regular rate of pay had

---

[50] Of course, DIRECTV argues it was not required to keep records of "[h]ours worked each workday and total hours worked each workweek," *see* 29 C.F.R. § 516.2(a)(7), because it was not plaintiffs' employer.

to be calculated on a weekly basis. *Johnson*, 4 F. Supp. 3d at 445 (citing 29 C.F.R. § 778.104, which provides that a single workweek is the standard and averaging of hours over 2 or more weeks is not permitted). Because the employer had not tracked actual weekly hours, the court held the defendant could not satisfy this prong of the exemption for that period.

Unlike the plaintiffs in *Johnson*, the estimated pay rates here are calculated on a weekly basis. Under 29 C.F.R. § 778.104, each workweek stands alone such that an employee who works 30 hours one week and 50 hours the next would be entitled to overtime compensation the second week even though the average between the two weeks is 40 hours per week. That is not the situation here. Roeder and Grill estimated that each week they worked at least 55 hours. They also estimated they were paid about $1,000 (Grill) and $1,200 (Roeder) per week.

Some courts have found a genuine issue of material fact on this element when neither party kept records of the number of hours worked. *See Klinedinst v. Swift Invs., Inc.*, 260 F.3d 1251, 1257 (11th Cir. 2001) (noting the number of hours worked per week was a genuine issue of material fact where plaintiff maintained that he worked at least 3,000 hours more than the regular 40-hour week during his period of employment). Other courts have found that a plaintiff's admission of weekly working hours and compensation is sufficient for a defendant to meet its burden of proving this element. *See Kuntsmann v. Aaron Rents, Inc.*, 903 F. Supp. 2d 1258 (N.D. Ala. 2012) (concluding plaintiff's testimony about his working hours and defendant's record of plaintiff's compensation proved that plaintiff's regular rate of pay exceeded one and one-half times the minimum wage). While plaintiffs argue that their weekly compensation estimates do not account for chargebacks or unreimbursed business expenses, they have not pointed to any evidence that deducting those items would reduce their rates of pay, as calculated on a weekly basis, below one and one-half times the minimum wage. Nor have they presented other evidence giving rise to a genuine issue of material fact on this element.

66

Even when viewing the facts in the light most favorable to plaintiffs, I find DIRECTV has met its burden of showing that plaintiffs' regular rate of pay was above one and one-half times the minimum wage.

Nonetheless, because DIRECTV has not established, as a matter of law, all three prongs that are required to establish a § 207(i) exemption, its motions for summary judgment must be denied on this issue. Plaintiffs' motion for summary judgment as to the non-application of this exemption must likewise be denied.

### 4. Is There Adequate Evidence Regarding DIRECTV's Knowledge of Any FLSA Violations?

DIRECTV argues that in order for plaintiffs to prevail on their FLSA overtime claims, they must demonstrate that DIRECTV "knew or should have known that [they were] working overtime." Doc. No. 59-3 at 13. I find this issue to be premature given that there are questions of fact to be resolved at trial as to whether plaintiffs were employees or independent contractors. DIRECTV's alleged knowledge that plaintiffs were working overtime hours will be a relevant issue only if (a) plaintiffs are found to have been DIRECTV employees and (b) the § 207(i) exemption does not apply. Therefore, DIRECTV's request for summary judgment on this basis will be denied.

### 5. Are Roeder's Claims Barred By The FLSA's Statute of Limitations?

DIRECTV argues that Roeder's claim is time-barred as to any work he performed prior to July 21, 2010. The FLSA's statute of limitations is two years, or three years if the plaintiff can show the violation was willful. *See* 29 U.S.C. § 255(a). The statute begins running from the date a plaintiff files a complaint or consents to join an action. 29 U.S.C. § 256. It is undisputed Roeder filed his consent to opt into a conditionally-certified FLSA action on July 21, 2012, in *Lang v. DirecTV*. *See* Doc. No. 89-1 at ¶ 112.

67

Roeder argues that there is sufficient evidence in the record for a jury to conclude that DIRECTV's alleged FLSA violation was willful. The Supreme Court has defined a "willful" violation as one where "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988). As with the issue of DIRECTV's knowledge of any alleged violation, I find that the degree of that knowledge – and whether it amounted to willfulness – is premature. Moreover, willfulness is an issue best left to the jury. *See Fowler v. Land Mgmt. Groupe, Inc.*, 978 F.2d 158, 163 (4th Cir. 1992) ("there is no reason that the issue of 'willfulness' should be treated any differently from other factual determinations relating to application of a statute of limitations that are routinely submitted to the jury."); *Morrison v. Quality Transports Servs., Inc.*, 474 F. Supp. 2d 1303, 1313 (S.D. Fla. 2007) ("The issue of willfulness under § 255(a) is a question of fact for the jury not appropriate for summary disposition.").

I note that when the record is viewed in the light most favorable to plaintiffs, there is some evidence from which reasonable jurors could find that any overtime violations by DIRECTV was willful. DIRECTV used both 1099 and W-2 technicians. It created daily work orders and assigned those orders to individual technicians, including plaintiffs. DIRECTV had some knowledge of plaintiffs' hours based on plaintiffs' availability and the work orders entered into its SIEBEL system, which includes an expected duration for each work order. While DIRECTV disputes that it used SIEBEL to track or manage a subcontractor's work, s*ee* Doc. No. 76-2 at ¶ 38, it admits that SIEBEL reflected the time period in which a technician may be scheduled to begin a job and tracked every work order from its creation until it was closed. *Id.* at ¶¶ 40, 46. The record demonstrates there are disputed facts relevant to the willfulness issue. Therefore, summary judgment on the issues of willfulness and the statute of limitations is inappropriate.

### 6.  *Do Plaintiffs Have Sufficient Proof of Damages?*

DIRECTV contends that the plaintiffs have no evidence showing the amount or extent of unpaid work.  They rely on *Holaway v. Stratasys, Inc.*, 771 F.3d 1057 (8th Cir. 2014), in which the court affirmed summary judgment in favor of the employer when the plaintiff failed to produce sufficient evidence of the amount and extent of overtime work.  Plaintiffs argue that *Holaway* and related cases make it clear that plaintiffs' burden to prove a violation of the FLSA is distinct and separate from their burden to prove the extent of their damages.

"An employee who sues for unpaid overtime 'has the burden of proving that he performed work for which he was not properly compensated.'"  *Holaway*, 771 F.3d at 1059 (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686-87 (1946)).  Employers are required to keep records of wages and hours for employees subject to the overtime requirements of the FLSA.  29 U.S.C. § 211(c).  "If an employer has failed to keep records, employees are not denied recovery under the FLSA simply because they cannot prove the precise extent of their uncompensated work."  *Holaway*, 771 F.3d at 1059.  Instead, the "most accurate basis possible" may be used to calculate compensation owed.  *Id.* (quoting *Dole v. Tony & Susan Alamo Found.*, 915 F.2d 349, 351 (8th Cir. 1990)).  Under this relaxed evidentiary standard, the employee must demonstrate work performed for which the employee was not compensated, and "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference."  *Carmody v. Kansas City Bd. Of Police Comm'rs*, 713 F.3d 401, 406 (8th Cir. 2013) (quoting *Anderson*, 328 U.S. at 687-88).  Then, the burden "shifts to the employer to produce evidence to dispute the reasonableness of the inference."  *Id.*

DIRECTV contends it is entitled to judgment as a matter of law on this basis because plaintiffs have come forward with only "contradictory and bare assertions" of unpaid hours worked.  As to Roeder, DIRECTV notes that he has not been forthcoming or consistent concerning the precise dates he worked for Wireless Technologies and

White Communications. Roeder also claimed in his answers to interrogatories that he worked approximately 55 hours per week, but in his deposition claimed he worked approximately 60 hours per week. In addition, Roeder admitted that he has never added up the hours he claims were spent performing tasks for which he allegedly was not paid and admits he has no documents or witnesses to support his allegation of 15 hours of unpaid work each week.

As to Grill, DIRECTV notes that he alleged he worked 50 hours per week in a discovery questionnaire, 60 hours per week in his complaint and 55 hours per week in his interrogatory answers and deposition. To the extent plaintiffs intend to rely on SIEBEL, DIRECTV objects because the subcontracting companies for which the plaintiffs worked engaged in "ghosting," meaning one technician would perform work under another technician's number. Therefore, according to DIRECTV, the hours reflected for plaintiffs may not accurately represent hours they actually worked. DIRECTV asserts that the plaintiffs have presented no competent evidence of the amount of any alleged, unpaid overtime hours worked and, therefore, that it is entitled to summary judgment.

Plaintiffs argue they have submitted sufficient evidence to demonstrate the *existence* of damages and they are not required at this point to demonstrate *how much* those damages may be. Plaintiffs admit that the evidence of their damages is limited to their own testimony. They contend they are unable to offer anything more precise because DIRECTV disregarded its alleged record-keeping obligations.

I find that summary judgment is not appropriate on this basis. While plaintiffs' evidence certainly gives rise to credibility issues, those issues are better left to a jury. *See Grage*, 813 F.3d at 1056 ("[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts should be left to the jury.") (internal quotations omitted). Plaintiffs have submitted sufficient evidence that, if credited, could lead the jury to conclude that they did suffer damages as a result of

70

DIRECTV's alleged overtime violations. DIRECTV will have the opportunity at trial to cross-examine plaintiffs on their estimates, point out the inconsistencies and argue why those estimates insufficient. At this stage, however, plaintiffs' evidence is sufficient to survive summary judgment.

## V. CONCLUSION

For the reasons stated herein:

1. Defendants' motion (Doc. No. 75) to strike the statement of Kevin Jackson in support of plaintiffs' motion for partial summary judgment is **denied**.

2. Plaintiffs' motion (Doc. No. 83) for leave to file statements of additional facts and appendices out of time is **granted.**

3. Defendants' motion (Doc. No. 59) for summary judgment on the claims of plaintiff Roeder is **denied.**

4. Defendants' motion (Doc. No. 62) for summary judgment on the claims of plaintiff Grill is **denied.**

5. Plaintiffs' motion (Doc. No. 67) for partial summary judgment is **denied.**

6. This case will proceed to trial as scheduled on June 5, 2017.

**IT IS SO ORDERED.**

**DATED** this 13th day of January, 2017.

_____
LEONARD T. STRAND
UNITED STATES DISTRICT JUDGE

71